2015 IL App (1st) 142435

No. 1-14-2435

Fifth Division
December 31, 2015

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | |
| | ) | Appeal from the Circuit Court |
| KIMBERLY K. ENDERS, | ) | of Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | No. 12 D 8020 |
| | ) | |
| and | ) | The Honorable |
| | ) | Renee M. Goldfarb, |
| MICHAEL A. BAKER, | ) | Judge Presiding. |
| | ) | |
| Respondent-Appellant. | ) | |

_____

JUSTICE GORDON delivered the judgment of the court, with opinion.
Presiding Justice Reyes and Justice Palmer concurred in the judgment and opinion.

**OPINION**

¶ 1   This appeal arises from the dissolution of the marriage of Kimberly K. Enders
(Kimberly), a lawyer, and Michael A. Baker (Michael), a CPA. Michael appeals the trial
court's division of property based on the parties' premarital agreement. He argues that the
trial court erred in ruling: (1) that there was a right of reimbursement to Kim for marital
funds that were paid into the two defined benefit pension plans of Michael; (2) that Michael's
2002 contribution to his 401(k) plan was partially made after the marriage and that Kimberly

had a right to reimbursement for the marital contribution portion of the 401(k) plan; (3) that a note payable was nonmarital property; (4) that a bank account for Michael's son should remain in Kimberly's custody; (5) that payments made by Kimberly to her children, from a previous marriage, and on her mortgage were permissible under the parties' premarital agreement; and (6) that he would have no visitation rights to the two dogs that were jointly owned by the parties. We affirm.

¶ 2                                            BACKGROUND

¶ 3                              I. Petition for Dissolution of Marriage

¶ 4        On August 21, 2012, Kimberly filed a petition for a dissolution of her marriage, pursuant to section 403 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/403 (West 2012)), alleging irreconcilable differences caused the irretrievable breakdown of her marriage.

¶ 5        The petition alleged that Kimberly and Michael were married on September 14, 2002, and that marriage was registered in the State of Illinois. No children were born or adopted as a result of the marriage. Kimberly sought to: (1) dissolve their marriage; (2) be awarded a just proportion of the marital property; (3) be assigned all her nonmarital property; and (4) enforce the parties' premarital agreement, executed on September 10, 2002, requiring a waiver of maintenance and the right to seek attorney fees from each other.

¶ 6                              II. Procedural History of Motions

¶ 7                     A. Custody and Visitation of the Parties' Two Dogs

¶ 8        On February 28, 2013, Michael filed a motion seeking visitation to the two dogs the parties acquired during their marriage. 750 ILCS 5/501 (West 2012).

¶ 9        The motion alleged that during the marriage, the parties acquired two dogs, Grace and Roxy. At the time of their separation from each other, it was contemplated by the parties that they would have joint custody of the dogs. However, Michael alleges that Kimberly refused to allow him visitation with the dogs since December 2012.

¶ 10       On April 15, 2013, the court granted Michael temporary visitation rights to the dogs on alternative weekends, from 10 a.m. Saturday until 8 p.m. Sunday.

¶ 11                          B. Verified Petition for Declaratory Judgment

¶ 12       On August 26, 2013, Kimberly filed a verified petition for declaratory judgment in this action with leave of court. 735 ILCS 5/2-701 (West 2012).  In a separate count, Kimberly sought a declaration, that the contractual terms and conditions of a premarital agreement, executed on September 10, 2002, were enforceable and should be incorporated into a judgment for dissolution of marriage.

¶ 13       Kimberly filed a memorandum of law in support of her petition. The memorandum alleged that at the time of her marriage to Michael, Kimberly was an equity partner at Spitzer, Addis, Susman & Krull, a law firm, and a shareholder of a genealogy firm known as Henry R. Ferris and Company. However, shortly after their marriage, both firms terminated their business. Currently, Kimberly is employed as a real estate finance attorney at Polsinelli PC, a large law firm.[1] At the time of the marriage, Michael was a consultant for Deloitte & Touche, a financial services company. Furthermore, Michael has a degree and MBA in finance. However, in August 2005, his position was eliminated, and Michael was out of work for approximately one year. Currently, Michael is employed by Marsh McLennan Shared

_____

[1] Kimberly claimed in her written interrogatory responses that she is a shareholder at Polsinelli PC. Additionally, in the trial court's judgment, note 11, the court noted that Kimberly's gross income per year is approximately $500,000.

Services Corporation, an insurance financial services company, as an accountant and is a CPA. Michael is currently earning approximately $140,000 per year.

¶ 14 Kimberly's memorandum of law alleged that both of the parties had been married once before and each had two children from their prior marriages. After Kimberly dissolved her marriage with her first husband, she was awarded a single-family home in Hinsdale. Prior to his marriage to Kimberly, Michael owned a single-family home in LaGrange.

¶ 15 On January 18, 2014, in response to Kimberly's petition for a declaratory judgment concerning the validity of the premarital agreement, the parties entered into an agreed order that the premarital agreement was valid, binding and enforceable.

¶ 16 III. The Premarital Agreement

¶ 17 The premarital agreement specifies that, in the event of a dissolution of marriage, the parties will waive maintenance and the right to seek attorney fees from each other. The terms of the premarital agreement provide that, should Kimberly and Michael dissolve their marriage, each party shall be awarded his or her nonmarital property, and 50% of the net-martial property.

¶ 18 A. Nonmarital Property

¶ 19 According to section 3 of the premarital agreement, "non-marital" property is defined as the property owned or acquired by either party which is and will remain after the marriage that party's individual property. Sections 3.2 and 3.3 provide that both parties agree that all property belonging to each party listed respectively on Exhibit "A" and "B" shall remain nonmarital property.

¶ 20 The premarital agreement provides in section 3.4 that any pension plan in which either party currently is or will be in the future a participant, including all increases in the value of

the plan during the marriage, whether due to appreciation, income, interest, employer contributions or employee contributions to the plan, shall be nonmartial property of the participant, but shall be subject to a right of reimbursement for the amount of the increase during the marriage ("Marital Increase") from (a) any contribution to the plan from marital property and (b) all appreciation, income or interest earned by the plan subsequent to the marriage of the parties calculated on a *pro rata* basis between the amount contributed and earned before the marriage and the amount contributed and earned after the marriage."

¶ 21    Section 3.7 provides that the residence owned by Kimberly in Hinsdale (Hinsdale Residence) shall remain and be the nonmartial property of Kimberly. Additionally, all property acquired by Kimberly in exchange for or with the proceeds from the Hinsdale Residence shall remain her nonmarital property. Section 3.8 provides that the residence owned by Michael in LaGrange (LaGrange Residence) shall remain and be the nonmarital property of Michael.

¶ 22    Section 3.12(c) specifies that all property acquired in exchange (including multiple exchanges) for nonmarital property shall be nonmarital property. Section 3.12(f) states that nonmarital property will remain the party's nonmarital property even though the form in which the property is held changes. Section 3.14 provides that each of the parties has the absolute right to manage, give, sell, devise, bequeath or otherwise dispose of or deal with his or her nonmarital property as though the parties were not married.

¶ 23    Additionally, section 3.12(d) states that, except as otherwise provided in the premarital agreement, nonmarital property of a party shall remain nonmarital regardless of any contributions to such property from marital property or from the nonmarital property of the

other party or from the person efforts or work of either party and shall not be subject to any right of reimbursement or claims for contributions.

¶ 24 Section 3.12(e) provides that nonmarital property remains nonmarital unless the owner declares in writing that the designated property is to be held and owned by the parties as martial property.

¶ 25 Finally, section 3.6 provides that Michael's interest and rights, including investments, assets or goodwill, as a partner, owner, or shareholder in any firm, organization or business including his firm Deloitte Consulting, is and shall remain his nonmarital property without any rights of reimbursement or claims for contribution.

¶ 26                    B. Use of Marital Funds With No Right to Reimbursement

¶ 27 According to section 4.2 payments made on mortgages, expenses, costs, taxes, and improvement for the Hinsdale Residence and the LaGrange Residence may be paid from marital property, with no right to reimbursement.

¶ 28 Additionally, section 4.6 provides that a party may pay for the support, including education, of his or her children from marital property, without any right of reimbursement. However, the total annual payments by each party from marital property for the support and education of his or her children may not exceed that party's net earned income without the consent of the other party.

¶ 29                    IV. Verified Petition for Partial Summary Judgment

¶ 30 On February 3, 2014, Kimberly filed a verified petition for partial summary judgment. Kimberly sought to be awarded a promissory note payable in the amount of $286,000 that was secured with a mortgage lien against the property in Riverside.

¶ 31        The petition alleged that on September 10, 2002, Kimberly executed a deed in trust, conveying title of the Hinsdale Residence, her nonmarital property, to the Kimberly K. Enders Trust as trustee under a trust agreement dated September 12, 2002.

¶ 32        On April 5, 2004, Kimberly also became the sole owner of JEHL Renovations, LLC (JEHL), a company that "flips real estate." Michael did not have an ownership interest in JEHL.

¶ 33        On June 16, 2006, JEHL purchased a property at 87 Forest Riverside, 60546 for $357,500. Michael was not on the title and did not contribute money towards the purchase of the Riverside property.

¶ 34        In order to purchase the Riverside property, Kimberly, d/b/a JEHL, took out a high-risk adjustable rate mortgage loan for 6.75% with The Private Bank for $286,000. Kimberly alleged that Michael has not made any payments toward the adjustable rate mortgage loan for the Riverside property.

¶ 35        In June 2011, Kimberly refinanced the mortgage loan on the Hinsdale Residence, and secured a new mortgage loan at a lower rate with The Private Bank for $417,000. From the amount received from The Private Bank mortgage loan, $234,955.20 was deposited into a bank account held solely in the name of Kimberly at The Private Bank. From that account, Kimberly paid $288,790.00 to pay off the adjustable rate mortgage loan held on the Riverside property.

¶ 36        The payoff of the adjustable rate mortgage loan in 2011 from the refinancing of the Hinsdale Residence was evidenced by a promissory note between JEHL and the Kimberly K. Enders Trust for $286,000. The promissory note secured a new mortgage loan for $286,000 against the Riverside property.

¶ 37    On March 4, 2014, the trial court denied Kimberly's motion for partial summary judgment.

¶ 38                              V. Stipulations

¶ 39    After trial commenced, the parties stipulated, on April 4, 2014, that:

¶ 40    Kimberly is currently a shareholder at Polsinelli PC, a law firm. Michael is currently employed by Marsh McLennan Shared Services Corporation, a financial services firm. Michael currently resides on Madison Street, in an apartment that he rents.

¶ 41    Both parties agree that the premarital agreement was executed on September 10, 2002, and it was admitted into evidence.[2]

¶ 42    Additionally, the parties stipulated that, on June 16, 2006, JEHL purchased a property at 87 Forest Avenue in Riverside, for $357,500. Title to the Riverside property at all times relevant has been in the name of JEHL, now known as 87 Forest LLC. In order to purchase the Riverside property, Kimberly, d/b/a JEHL, took out an adjustable rate mortgage loan for with The Private Bank for $286,000.

¶ 43    The parties further stipulated that, in June 2011, Kimberly refinanced the mortgage loan on the Hinsdale Residence, and secured a new mortgage loan at a lower rate with The Private Bank for $417,000. From the amount received from The Private Bank mortgage loan, $234,955.20 was deposited into a bank account held solely in the name of Kimberly at The Private Bank. From that account, Kimberly paid $288,790 to pay off the adjustable rate mortgage loan held on the Riverside property.

---

[2] The trial court had previously found the premarital agreement enforceable; and that finding is not disputed on appeal.

¶ 44   The parties further stipulated that Michael owns a defined benefit retirement pension plan with Deloitte LLP. Pension benefits for Michael in the Deloitte plan accrued on his services between January 30, 1997 and March 1, 2006. However, Michael did not list his interest in the Deloitte plan on Exhibit A that he attached to the premarital agreement.

¶ 45               VI. Trial

¶ 46   The record on appeal contains the testimony of four witnesses who testified at trial: (1) Kimberly Enders, the petitioner; (2) Michael Baker, the respondent; (3) Sander Goldstein, an actuary called by Michael; and (4) Gregory Papiernik, an attorney and CPA called by Kimberly to provide an opinion on the marital increase of a pension plan.

¶ 47            A. Kimberly's Testimony

¶ 48               1. JEHL

¶ 49   On direct examination, Kimberly testified that Michael knew that JEHL was created solely in Kimberly's name and he did not want to be an owner in JEHL. Kimberly concedes that Michael was involved in the process of buying and selling properties with JEHL; however, Michael did not sign any documents on behalf of JEHL or put forth any financial contribution on the property purchase.

¶ 50         2. Dissipation of Marital Funds

¶ 51   On redirect, Kimberly testified that The Private Bank account was comprised of her marital and nonmarital money. Kimberly clarified that her earnings deposited in the account are marital, but the money that was liquidated from her nonmarital assets remained non-marital. Additionally, Kimberly deposited the child support payments paid by her previous husband and gifts from her mother in the account, which are nonmarital. Kimberly testified that she mixed the funds together like "one big sack of rice."

¶ 52    Kimberly testified that she categorized The Private Bank account as "marital property" on her response to the interrogatories because she did not have a category for funds mixed with both marital and nonmarital property.

¶ 53    Kimberly testified that she controls three Fidelity Children's Accounts, 529 accounts, for her two children from a prior marriage, Jordan and James, and her stepson, Erik. Erik's 529 account has a total of $21,307.62, which was provided solely by Kimberly.

¶ 54    Additionally, Kimberly created a savings account for her son Jordan and a Illinois Uniform Transfers to Minors Act[3] account for her son James. Her son Jordan recently graduated from college, but plans on attending graduate school. Her son James is currently at the University of Iowa, with approximately three more years of schooling, which will cost approximately $120,000.

¶ 55    On December 1, 2011, Kimberly placed $20,000 in Jordan's and James' education accounts. Additionally, on July 23, 2012, $23,000 was placed in each of her children's accounts, with an additional $5,000 going to Jordan's account. Finally, in December of 2012, Kimberly placed $45,000 in each of the children's accounts.

¶ 56    On cross-examination, Kimberly testified that on March 7, 2014, she made additional mortgage payments on the Hinsdale Residence for $136,907.23. However, she expressed that she made additional principal payments to her mortgage "all the time."

¶ 57                                    3. The Parties' Two Dogs

¶ 58    On direct examination, Kimberly testified that the parties acquired two dogs during their marriage. Gracie is 11 years old with a shoulder injury and cataracts. Roxie is 7 years old. The two dogs were left in the care of Kimberly when Michael moved out in 2011.

---

[3] 760 ILCS 20/1 *et seq.* (West 2012).

Additionally, Kimberly testified that "there is always someone at the house." Kimberly testified that the dogs are big and "use to" a big yard.

¶ 59                    4. Michael's 401(k) Contribution

¶ 60        On direct examination, Kimberly testified that she calculated Michael's cash flow in 2002, using his mortgage application which he executed, in July 2002, when he refinanced his LaGrange Residence. Kimberly calculated Michael's gross income less taxes, maintenance payments, monthly payments, and alleged contributions to the 401(k) for nine months. Based on this information, Kimberly estimated that Michael's cash flow in 2002 would allow only $486 per month for living costs if Michael contributed to the 401(k) prior to their marriage.

¶ 61                       B. Michael's Testimony

¶ 62                             1. JEHL

¶ 63        On direct examination, Michael testified that he did not know that Kimberly was the sole member of JEHL. Furthermore, Michael considers himself a half owner, although he contributed zero capital and did not sign purchase agreements for the property.

¶ 64        Additionally, Michael was in a protracted postjudgment proceeding with his former wife Bonny. Bonny's lawyer served a subpoena, and there was concern that documents regarding JEHL would be turned over to her. Michael vaguely remembers sending his attorney an email, which copied Kimberly, expressly stating that he had no interest in JEHL.

¶ 65                        2. Erik's Bank Account

¶ 66        On direct examination, Michael testified that Kimberly cared for Erik like her own son.

¶ 67                                   3. The Parties' Two Dogs

¶ 68        On cross-examination, Michael testified that the parties acquired two dogs during their marriage, Gracie and Roxy. Currently, Michael has visitation rights to the dogs. However, Michael's apartment lease does not allow pets. Michael testified that he has a verbal agreement with his landlord to allow the dogs to visit periodically.

¶ 69                                     4. Deloitte Pension

¶ 70        On cross-examination, Michael testified that he owns an interest in a defined benefit retirement pension plan with Deloitte LLP, and the benefits accrued based on his employment between January 30, 1997 and March 1, 2006.

¶ 71        Michael testified that he did not include the Deloitte pension in the list of his nonmarital property at the time of the premarital agreement as an asset because he "didn't really think about it."

¶ 72                               5. Michael's 401(k) Contribution

¶ 73        On cross-examination, Michael testified that in 2002, he contributed $11,000 to his 401(k) plan at Deloitte. Michael is confident that the full contribution was made before the marriage of the parties; however, Michael was not able to retrieve the 401(k) contribution records from Deloitte. Additionally, Michael testified that money was deducted from his paycheck to contribute to the 401(k).

¶ 74                                   C. Goldstein's Testimony

¶ 75        Michael called as an expert witness Sander Goldstein, an actuary who values pension plans and has been testifying in dissolution of marriage cases for over 30 years. Goldstein testified that he has appeared as an expert in court approximately 5 to 10 times per year and prepares approximately 30 valuations every year. Goldstein testified that the Deloitte

pension fell within the parameters of the premarital agreement. The current value of the pension is $274,130. Additionally, Goldstein testified that, out of the 9.08 years of Michael's service at Deloitte, and 3.6 years of marital service during those years, the marital increase equaled 39.6%. Goldstein had been given the incorrect date of Michael's termination and gave updated testimony at trial from the correct termination date of March 1, 2006. Additionally, he testified that this pension plan was a defined benefit plan in the private sector, which means only the employer makes contributions.

¶ 76     On cross-examination, Goldstein explained that, under a defined benefit plan, employers contribute to the pension because the employee provides service to the company.

¶ 77                              D. Papiernik's Testimony

¶ 78     On direct examination, Gregory Papiernik testified that he was an attorney, CPA, and managing partner of Levin & Brend, P.C., a law firm, and was hired by Kimberly to give an opinion as to the value of the Deloitte 401(k) retirement account. Papiernik testified that, in the past five years, he has testified as an expert witness two times before a court, and had his deposition taken approximately five times. Papiernik opined on the marital increase from contributions to disclosed and undisclosed retirement assets from marital property, and estimated that the "post-marriage" contribution to the 401(k) in the year 2002 was $3,666.67. Papiernik based the amount on a Deloitte Vanguard statement for the fourth quarter of 2002 which indicated that the contribution for the period in question, between October 1, 2002 and December 1, 2002, was $3,666.67.

¶ 79                                  VII. Judgment

¶ 80     On July 17, 2014, after hearing closing arguments, the trial court found that the following are free and clear of any claim by Michael Baker: (1) all cash, bank accounts, stocks, bonds,

options, insurance policies, retirement accounts and assets presently in Kimberly Enders' name or in the name of her Living Trust; 87 Forest LLC, formerly known as JEHL, and all property held therein; (2) the promissory note in the amount of $286,000; (3) all of the Fidelity Children's Accounts that are held for the benefit of the children to wit: Jordan Pranger, James H. Pranger and Erik Baker; and (4) the Hinsdale Residence. Additionally, the trial court included 39.6% of the Deloitte pension plan in the final valuation of the marital increases to Michael's retirement accounts. Michael had only one disagreement with Papiernik's calculation and that related to the martial portion of Michael's Deloitte 401(k).[4] The trial court found that Papiernik gave comprehensive and credible testimony. However, the trial court did not find Michael's testimony to be credible. Finally, the dogs Gracie and Roxy were awarded solely to Kimberly. This appeal follows.

¶ 81                                    ANALYSIS

¶ 82        On appeal, Michael alleges the trial court erred by ruling: (1) that there was a right of reimbursement to Kim for marital funds that were paid into the two defined benefit pension plans of Michael; (2) that Michael's 2002 contribution to his 401(k) plan was partially made after the marriage and that Kimberly had a right to reimbursement for the marital contribution portion of the 401(k) plan; (3) that a note payable was nonmarital property; (4) that a bank account for Michael's son should remain in Kimberly's custody; (5) that payments made by Kimberly to her children, from a previous marriage, and on her mortgage were permissible under the parties' premarital agreement; and (6) that he would have no visitation rights to the two dogs that were jointly owned by the parties.

---

[4] Michael disagreed with Papiernik's calculations related to the marital portion of his Deloitte 401(k) plan. Michael testified that in 2002, he contributed the entire $11,000 that year prior to the date of the marriage on September 14, 2002. Papiernik did a *pro rata* calculation of the marital portion of the Deloitte 401(k) plan for 2002 which came to $3,666.

¶ 83                              I. Defined Benefit Pension Plans

¶ 84          Michael claims that the trial court erred by ruling that there was a right of reimbursement to Kim for marital funds that were paid into two defined benefit pension plans of Michael, one from Deloitte and one from Marsh McLennan Shared Services Corporation. Michael contends that, under the terms of the premarital agreement, there is no right of reimbursement for defined pension plans.

¶ 85          Valid premarital agreements are contracts, and the rules governing the interpretation of contracts apply to their interpretation. *In re Marriage of Best*, 387 Ill. App. 3d 948, 949 (2009). The primary objective of contract interpretation is to ascertain the intent of the parties. *Gallagher v. Lenart*, 226 Ill. 2d 208, 232-33 (2007). When the language of the contract is clear and unambiguous, a court decides the intent of the parties solely from the words of the contract, given their plain and ordinary meaning. *Best*, 387 Ill. App. 3d at 949. Additionally, construction of a contract presents a question of law, subject to *de novo* review. *Id. De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 86          Kimberly cited *In re Marriage of Hunt* which found that nonvested pension interests "earned during marriage should be included in the marital property divided between husband and wife upon divorce."[5] *In re Marriage of Hunt*, 78 Ill. App. 3d 653, 660 (1979). The court found that retirement pensions are not gratuities, but are part of the consideration earned by the employee for his or her services. *Hunt*, 78 Ill. App. 3d at 661.

---

[5] We could not locate a more recent case specifically addressing nonvested pension plans. *Hunt* is still considered to be good law, and was cited with approval by *In re Marriage of Wendt*, 2013 IL App (1st) 123261.

¶ 87 In the case at bar, Michael omitted the Deloitte defined benefit pension plan when the parties made a list of their nonmarital property in preparation for the premarital agreement, and he testified at trial that he did so because he "didn't really think about it."

¶ 88 Michael claims that, unlike defined pension contribution plans, defined pension benefit plans do not typically involve salary reductions. Therefore, Michael argues that the method of calculating the right of reimbursement under section 3.4 cannot be applied to the defined pension benefits plan because the plans were an employment-related perk, similar to buying stock in an employer, and therefore should be treated like stock purchases, an investment without any rights of reimbursement, under section 3.6. Michael claims that there is no way to calculate reimbursement for a defined pension benefit plan.

¶ 89 Contrary to Michael's claim, the right of reimbursement provision in section 3.4 of the premarital agreement states that it applies to "any" pension plan, and it does not exclude defined pension benefit plans.

¶ 90 Section 3.4 of the premarital agreement provides that "any pension plan in which either party currently is or will be in the future a participant, ***, shall be non-marital property of the participant, but shall be subject to a right of reimbursement for the amount of increase during the marriage from (a) any contribution to the plan from martial property and (b) all appreciation, income or interest earned by the plan subsequent to the marriage of the parties calculated on a *pro rata* basis between the amount contributed and earned before the marriage and the amount contributed and earned after the marriage." "Any" is a broad and inclusive term which the Merriam-Webster Dictionary defines as "one or some indiscriminately of whatever kind." Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/any (last visited Oct. 19, 2015).

16

¶ 91      As a result, the plain and ordinary meaning of "any" indicates that all types of pension plans shall be included and subject to a right of reimbursement for the amount of increase during the marriage; and this includes defined pension benefit plans.

¶ 92      Further, the testimony at trial shows that the court's conclusion was not against the manifest weight of the evidence. A finding is against the manifest weight of the evidence when the opposite conclusion is clearly evident or where it is unreasonable, arbitrary, and not based on the evidence. *In re Marriage of Berger*, 357 Ill. App. 3d 651, 660 (2005) (citing *Maple v. Gustafson*, 151 Ill. 2d 445, 454 (1992)). Michael's expert witness, Goldstein, testified that the Deloitte pension fell within the parameters of the premarital agreement and there was no evidence presented that it did not.

¶ 93      Michael's claim that there is no way to calculate the value of the marital funds that were paid into the Deloitte benefit pension plan is not persuasive. Gregory Papiernik's testimony as an expert provided an acceptable calculation of the marital increase in the Deloitte pension.

¶ 94      As a result, we cannot say that the trial court erred in finding that the defined pension benefit plans were subject to a right of reimbursement for the marital contributions that were made.

¶ 95                              II. Michael's Contribution to Deloitte 401(k)

¶ 96      Michael next argues that the trial court erred by finding that he made partial contributions to the Deloitte 401(k) after their marriage. Michael contends that he is certain that he made full contribution by September 1, 2002, before his marriage to Kimberly.

¶ 97      Michael's claim on appeal is that the trial court erred by finding his testimony not to be credible, while finding Papiernik's testimony credible. Furthermore, Michael argues that he

17

front-loaded his 401(k) contributions in later years which supports his assertion that he made the full contribution before marriage.

¶ 98    A trial court's credibility determination is afforded great deference because "it has the best opportunity to view and evaluate the parties and their testimony." *In re Gwynne P.*, 346 Ill. App. 3d 584, 590 (2004). As we have noted, the trial court's factual findings will not be disturbed on appeal unless they are against the manifest weight of the evidence. *Gwynne P.*, 346 Ill. App. 3d at 590. A finding is against the manifest weight of the evidence when the opposite conclusion is clearly evident or where it is unreasonable, arbitrary, and not based on the evidence. *Berger*, 357 Ill. App. 3d at 660.

¶ 99    Here, Michael failed to provide any records from Deloitte concerning his 401(k) contribution from Deloitte. Michael admitted at trial that the contribution funds were deducted from his paycheck. Kimberly's witness, Papiernik, opined that the postmarriage contribution to the Deloitte 401(k) in 2002 was $3,666.67. Papiernik based this amount on a Deloitte Vanguard statement for the fourth quarter of 2002 which indicated that the contribution, between October 1, 2002 and December 1, 2002 was $3,666.67. This was after the parties' marriage on September 14, 2002.

¶ 100    Thus, Michael's argument is not persuasive.

¶ 101                                    III. JEHL

¶ 102    Michael next claims that the trial court erred by finding that the JEHL promissory note was nonmarital property, when the note was acquired during the marriage. Michael argues that there were two sources of funds for the JEHL note: (1) funds from the refinancing of the Hinsdale Residence; and (2) funds from the account. Michael claims that, because the funds

in the account were partially marital, at least part of the source of funds for the JEHL mortgages was marital.

¶ 103    We apply the manifest weight of evidence standard to the trial court's findings on the existence of martial and nonmarital property. *In re Marriage of Demar*, 385 Ill. App. 3d 837, 850 (2008). A decision is against the manifest weight of the evidence when the opposite conclusion is clearly evident or where it is unreasonable, arbitrary, and not based on the evidence. *Berger*, 357 Ill. App. 3d at 660.

¶ 104    Contrary to Michael's assertion, section 3.7 of the premarital agreement provides that "[Michael] agrees that the Hinsdale Residence shall remain and be the non-martial property of [Kimberly] and waives his rights to homestead in the Hinsdale Residence." Additionally, section 3.7 provides that all property acquired by Kimberly "in exchange for or with the proceeds" from the Hinsdale Residence shall remain her nonmarital property.

¶ 105    Black's Law Dictionary defines "proceeds" as, "[s]omething received upon selling, exchanging, collecting, or otherwise disposing of collateral. Proceeds differ from other types of collateral because they constitute any collateral that has changed in form." Black's Law Dictionary 1242 (8th ed. 2004). Thus, the plain and ordinary meaning of "proceeds" includes anything that resulted from an exchange of nonmarital property.

¶ 106    Section 3.12(d) states that, except as otherwise provided in the premarital agreement, nonmarital property of a party shall remain nonmarital regardless of any contributions to such property from marital property or from the nonmarital property of the other party or from the person's efforts or work of either party and shall not be subject to any right of reimbursement or claims for contributions.

¶ 107    In the case at bar, Kimberly was the sole owner of JEHL. Furthermore, Michael admitted at trial that he did not contribute capital to JEHL and did not sign purchase agreements for the property. JEHL purchased the Riverside property by taking out a high-risk adjustable rate mortgage. Thereafter, Kimberly refinanced the Hinsdale Residence, her nonmarital property, and secured a new mortgage loan. From the amount received, Kimberly paid off an adjustable rate mortgage for the Riverside property which was evidenced by a promissory note between JEHL and the Kimberly K. Enders Trust.

¶ 108    Kimberly acquired the JEHL promissory note "in exchange for or with the proceeds" from the Hinsdale Residence as section 3.7 provided. Thus, according to section 3.7, the promissory note remained nonmarital.

¶ 109    Furthermore, section 3.12(d) of the premarital agreement states that the nonmarital property of a party shall remain nonmarital regardless of any contributions to such property from marital property. In the case at bar, Kimberly used account 44157, which included marital money from her earnings and also nonmarital money from child support and other liquidated assets. According to section 3.12(d), the nonmarital property remains nonmarital regardless of the contributions from marital funds.

¶ 110    As a result, we cannot say that the trial court's decision on this issue was against the manifest weight of evidence. See *Berger*, 357 Ill. App. 3d at 660.

¶ 111                              IV. Erik's 529 Account

¶ 112    Michael contends that the trial court erred by denying his request to transfer custodianship on Erik's account from Kimberly to Michael. Michael argues that although the account was established for the benefit of Erik, it is possible for Kimberly to cancel the

account or keep the money herself. Michael contends that the doctrine of judicial estoppel precludes Kimberly from gifting the account to herself.

¶ 113    A trial court's credibility determination is afforded great deference because "it has the best opportunity to view and evaluate the parties and their testimony." *Gwynne P.*, 346 Ill. App. 3d at 590. The trial court's factual findings will not be disturbed on appeal unless they are against the manifest weight of the evidence. *Gwynne P.*, 346 Ill. App. 3d at 590.

¶ 114    Under Illinois law, there are five elements to judicial estoppel: (1) the two positions must be taken by the same party; (2) the two positions must be totally inconsistent; (3) the positions must be taken in judicial proceedings; (4) the positions must be given under oath; and (5) the party must have successfully maintained the first position, and received some benefit thereby. *People v. Runge*, 234 Ill. 2d 68, 132 (2009).

¶ 115    Michael contends that the doctrine of judicial estoppel precludes Kimberly from asserting at trial that she created the 529 bank account for her stepson's benefit, and then when the trial court is no longer looking, take the money back for her own benefit.

¶ 116    Michael argues that at trial, Kimberly took the position that she created the account for the benefit of Erik. Michael asserts that now, Kimberly takes the position that the account is her property and she may do with it as she pleases. Michael argues that even though the account was established for the benefit of Erik, it remains possible for Kimberly to cancel the account, pay the penalty for cancellation, and keep the money for herself.

¶ 117    Contrary to Michael's assertion, the second element is not supported by any facts. In the case at bar, Michael fails to support his assertion that Kimberly takes two positions that are "totally inconsistent" with each other. Although Kimberly took the position that she created the account for the benefit of Erik, Michael fails to support his assertion with any evidence

that Kimberly now takes the position that the account is her property. Michael also fails to show that the trial court's finding was against the manifest weight of the evidence because he fails to cite any document in the record showing that Kimberly sought to cancel the account or keep the money herself. Rather, at trial, Michael testified that Kimberly cared for Erik like her own son.

¶ 118    Therefore, the trial court's decision to continue Kimberly as the custodian of Erik's 529 account was not against the manifest weight of the evidence.

¶ 119                                    V. Dissipation of Marital Funds

¶ 120    Michael next argues that the trial court erred by finding that the payments to Kimberly's children and payment on her mortgage were not a breach of the good faith principle in contract law.

¶ 121    Kimberly argues that the duty of good faith and fair dealing is used as a construction aid in determining the intent of the parties where an instrument is susceptible to two conflicting constructions. *Seip v. Rogers Raw Materials Fund, L.P.*, 408 Ill. App. 3d 434, 443 (2011). The trial court accepted Kimberly's argument, but we find that the trial court viewed the implied covenant of good faith too narrowly. However, we may affirm on any basis appearing in the record, whether or not the trial court relied on that basis or its reasoning was correct. *Benson v. Stafford*, 407 Ill. App. 3d 902, 912 (2010).

¶ 122    Again, our standard of review is manifest weight of the evidence. *In re Gwynne P.*, 346 Ill. App. 3d 584, 590 (2004) (a trial court's factual findings will not be disturbed unless they are against the manifest weight of the evidence). In this case, the doctrine of good faith performance imposes a limitation on the exercise of discretion vested in one of the parties to a contract. *Dayan v. McDonald's Corp.*, 125 Ill. App. 3d 972, 990-91 (1984). In describing

22

the nature of that limitation, the courts of this state have held that a party vested with contractual discretion must exercise that discretion reasonably and with proper motive, and may not do so arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties. *Foster Enterprises, Inc. v. Germania Federal Savings & Loan Ass'n*, 97 Ill. App. 3d 22, 30-31 (1981); *Pierce v. MacNeal Memorial Hospital Ass'n*, 46 Ill. App. 3d 42, 51 (1977).

¶ 123    Section 4.2 of the premarital agreement provided that payments made on mortgages, expenses, costs, taxes, and improvement for the Hinsdale Residence and the LaGrange Residence may be paid from marital property, with no right to reimbursement. Section 4.6 of the premarital agreement gave each party the discretion to make educational payments for their children for marital funds. The parties also freely contracted that the only restriction on this discretion would be that the payments not exceed that party's annual income. The parties stipulated in this case to the validity of the premarital agreement, and Michael never claimed that the premarital agreement was against public policy, or that the funds placed into the children's accounts did not have the requisite safeguards needed to make sure that the funds were used for educational purposes. In this case, Kimberly made payments that were much less than her annual income. Since Michael agreed to this limitation, we cannot say that Kimberly's actions were inconsistent with his reasonable expectations. The educational payments made by Kimberly for her children were permitted by section 4.6 of the party's premarital agreement and the mortgage payments were permitted by section 4.2, regardless of whether from marital or nonmarital funds, and did not violate the implied covenant of good faith and fair dealing.

¶ 124        In addition, Michael claims that Kimberly paid approximately $136,000 on her mortgage on the Hinsdale home before trial. The trial court found that all of these funds were non-marital. The parties stipulated that $99,576.00 was non-marital, and the trial court found that the balance was also non-marital. We cannot say that the opposite conclusion is clearly evident, or that the trial court's findings are unreasonable, arbitrary, and not based on the evidence.

¶ 125        As to the $3,830.00 charitable contributions, this was less than the amount Kimberly usually contributes to charity in any given year, so it cannot be a dissipation of marital funds if marital funds were used.

¶ 126        We cannot find that there is any dissipation of marital funds based on the manifest weight of the evidence.

¶ 127                                VI. The Parties' Two Dogs

¶ 128        Finally, Michael argues that the trial court erred in denying his request for visitation with the parties' two dogs. Specifically, Michael contends that the court should make it clear that an Illinois court has the authority to order pet visitation. Michael asserts that visitation would be in the best interest of the parties.

¶ 129        Whether a court has the authority to order pet visitation is a question of first impression in Illinois. Although we could not find an Illinois case that addressed visitation with regard to pets, the trial court cited to a decision from New York that did not allow dog visitation. *Travis v. Murray*, 977 N.Y.S.2d 621, 631 (N.Y. Sup. Ct. 2013). The New York Supreme Court declined to apply the "best interests" of the dogs standard because dogs do not rise to the same level of importance as children. *Travis*, 977 N.Y.S.2d at 631. The court applied a "best for all concerned" standard, maintaining that "household pets enjoy a status greater

than mere chattel." (Internal quotation marks omitted.) *Travis*, 977 N.Y.S.2d at 631. However, the court stated that awarding visitation "would only serve as an invitation for endless post-divorce litigation." *Travis*, 977 N.Y.S.2d at 631.

¶ 130　　In general terms, a trial court's credibility determination is afforded great deference because "it has the best opportunity to view and evaluate the parties and their testimony." *Gwynne P.*, 346 Ill. App. 3d at 590. The trial court's factual findings will not be disturbed on appeal unless they are against the manifest weight of the evidence. *Gwynne P.*, 346 Ill. App. 3d at 590. However, when the exercise of discretion presents a question of law, we review that determination as *de novo*. *Geisler v. Everest National Insurance Co.*, 2012 IL App (1st) 103834. *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan*, 408 Ill. App. 3d at 578.

¶ 131　　As far as we know, the only statutory definition for a dog owner in Illinois is provided by the Animal Control Act. 510 ILCS 5/2.16 (West 2014). Pursuant to section 2.16 of the Animal Control Act, an owner is defined as "any person having a right of property in an animal, or who keeps or harbors an animal, or who has it in his care, or acts as its custodian." 510 ILCS 5/2.16 (West 2014).

¶ 132　　In the case at bar, Kimberly is the dogs' owner under this definition because the dogs were left in her "care" when Michael moved out of the Hinsdale Residence in 2011. As a result, she is the one who "keeps or harbors" the dogs and has them "in [her] care" and acts as their regular "custodian." 510 ILCS 5/2.16 (West 2014). Michael testified at trial that he currently resides in an apartment where the lease does not allow pets, although he contends that he has a verbal agreement with his landlord to allow the dogs periodically.

¶ 133    Because of the scarcity of Illinois case law addressing this issue, it is useful to look to decisions from courts of other states. In New York, the court observed that awarding pet visitation "would only serve as an invitation for endless post-divorce litigation." *Travis*, 977 N.Y.S.2d at 631. Thus, in light of the New York case and the definition of a dog owner in Illinois law, we cannot say that the trial court's decision was against the manifest weight of the evidence.

¶ 134                              CONCLUSION

¶ 135    For the foregoing reasons, we find that the trial court did not err in finding: (1) that there was a right of reimbursement to Kim for marital funds that were paid into the two defined benefit pension plans of Michael; (2) that Michael's 2002 contribution to his 401(k) plan was partially made after the marriage and that Kimberly had a right to reimbursement for the marital contribution portion of the 401(k) plan; (3) that a note payable was nonmarital property; (4) that a bank account for Michael's son should remain in Kimberly's custody; (5) that payments made by Kimberly to her children, from a previous marriage, and on her mortgage were permissible under the parties' premarital agreement; and (6) that he would have no visitation rights to the two dogs that were jointly owned by the parties.

¶ 136    Affirmed.