OPINION OF THE COURT
Matthew F. Cooper, J.
People who love their dogs almost always love them forever. *448 But with divorce rates at record highs, the same cannot always be said for those who marry. All too often, onetime happy spouses end up as decidedly unhappy litigants in divorce proceedings. And when those litigants own a dog, matrimonial judges are called upon more and more to decide what happens to the pet that each of the parties still loves and each of them still wants. This case concerns one such dog, a 2V2-year-old miniature dachshund named Joey.
Joey finds himself in a tug-of-war between two spouses in the midst of a divorce proceeding to end their extremely short and childless marriage. In fact, the only issue in this case is what will become of the parties’ beloved pet. Plaintiff, Shannon Louise Travis, alleges that the defendant, Trisha Bridget Murray, wrongfully took Joey at the time the couple separated. Consequently, by way of this motion, she seeks not only an order requiring defendant to return Joey to her, but an order awarding her what she terms “sole residential custody” of the dog.
Background
The first divorce case I heard involving a dog was a postjudgment proceeding in 2010. The dog in question, Otis, was a 15-year-old yellow Labrador retriever. The ex-wife alleged that her ex-husband had taken Otis from her home without her permission and had refused her and their children access to him. As a result, she filed a motion seeking an order giving her “full custody” of the dog. During the same time period, the February 1, 2010 issue of New York magazine hit the newsstand. The magazine’s cover featured a photograph of a Boston terrier staring up with a face exhibiting equal parts bemusement and bewilderment. Like many of us, the dog was no doubt considering the question that appeared next to the photograph: A Dog Is Not a Human Being Right?
With its finger on the pulse of our collective New York psyche, the issue’s lead story, The Rise of Dog Identity Politics, vividly described a canine-centric city where dogs play an ever more important role in our emotional lives (John Homans, The Rise of Dog Identity Politics, New York, Feb. 1, 2010 at 20). It detailed many aspects of what the writer referred to as the “humanification” of our pets, from the foolishness of high-end doggie boutiques to the morality of spending untold sums of money to prolong a dog’s naturally limited life with extensive medical procedures. I intended to discuss the story in my Otis decision.
However, before that decision was complete, the ex-wife, for reasons that included Otis’s advanced age and failing health, *449 withdrew her motion. Sadly, Otis died a few months later, thus in his own way resolving once and for all the strife that had surrounded him during the last year of his life. Because Joey, the dog at issue here, is so young, with a life-span of at least another 10 years, it is unlikely that the battle being fought over bim will be abated by death, as was the case with Otis. Rather, all indications are that this court will be called upon to decide with whom Joey will spend the rest of his years.
Coincidently, with a new canine case before me, another of New York City’s major publications ran an opinion piece examining the unique relationship between dogs and people. The piece, Dogs Are People, Too, which appeared in the Sunday Review section of the New York Times, urges that dogs be granted what the author calls “personhood.” In taking this position, the author, a neuroscientist, relies on MRI scans that he contends show dogs to have a range of emotions similar to those of human beings (Gregory Berns, Dogs Are People, Too, NY Times, Oct. 6, 2013, § SR at 5, col 1).
The earlier New York magazine story and the more recent Times opinion piece highlight the distinct trend towards looking at dogs as being far more than property, a trend that has only intensified over the last few years. Whereas the New York story looked at “dog humanization” from a slightly ironic perspective, the Times piece, with its insistence upon dog-personhood, is quite serious in its call for dogs to be treated much the same way we treat people.
Neither of the two articles mention dog custody. In fact, it appears that the last time the subject was discussed in the New York press was on August 22, 1999, when the Times ran a story in the Style section entitled After the Breakup, Here Comes the Joint-Custody Pet (Alexandra Zissu, After the Breakup, Here Comes the Joint-Custody Pet, NY Times, Aug. 22, 1999, § S). What is even more surprising, considering New Yorkers’ dedication to their dogs and their propensity for litigation, is that there are so few reported cases from the courts of this state dealing with pet custody in general and no cases at all making a final award of a pet to either side in the context of a divorce. As a result, courts are left with little direction with respect to questions surrounding dog custody: Can there be such a thing as “custody” of a canine? If so, how is a determination to be made? And if not, how does the court decide what happens when a couple divorces and each of them wants the beloved dog as her own?
*450 Facts and Parties’ Contentions
Plaintiff and defendant were married on October 12, 2012. Before their marriage, they resided in the same Upper Manhattan apartment that they continued to occupy after the marriage. On February 6, 2011, while the parties were living together but before they married, plaintiff bought Joey from a pet store. At the time of his purchase, Joey was a 10-week-old puppy.
On June 11, 2013, defendant moved out of the marital apartment while plaintiff was away from New York on a business trip. Defendant took some furniture and personal possessions with her. She also took Joey. According to plaintiff, defendant first refused to tell her where Joey was but then later claimed that she had lost him while walking in Central Park.
Plaintiff filed for divorce on July 11, 2013. Two months after the commencement of the divorce, plaintiff brought this motion. In her application, plaintiff requested that defendant be directed to immediately account for Joey’s whereabouts since the date he was removed from the marital apartment, that he be returned to plaintiff’s “care and custody,” and that she be granted an “order of sole residential custody of her dog.” Once the motion was made, defendant revealed that Joey was never lost in Central Park, but instead was living with her mother in Freeport, Maine. Thus, this leaves the last two prongs of the motion to be resolved.
Plaintiff argues that Joey is her property because she bought him with her own funds prior to the marriage. She alleges that defendant, in effect, stole the dog when she removed him from the marital apartment and subsequently relocated him to Maine. Moreover, asserting that she “was the one who cared for and financially supported Joey on a primary basis,” plaintiff contends that it is in Joey’s “best interests” that he be returned to her “sole care and custody.”
Defendant opposes the motion in all respects. In so doing, she states that Joey was a gift to her from plaintiff as a consolation for her having to give away her cat at plaintiffs insistence. Defendant further contends that she shared financial responsibility for the dog, that she “attended to all of Joey’s emotional, practical, and logistical needs,” and that “Joey’s bed was next to [her] side of the marital bed.” Finally, defendant submits that it is in Joey’s “best interests” not to be with plaintiff, but instead to be with her mother in Maine, where defendant can see him regularly and where he is “healthy, safe and happy.”
*451 Thus, both sides invoke two different approaches in determining which one should be awarded Joey. The first approach is the traditional property analysis, with plaintiff maintaining that Joey is her property by virtue of having bought him and defendant maintaining that the dog is hers as a result of plaintiff having gifted him to her. The second approach is the custody analysis, with each side calling into play such concepts as nurturing, emotional needs, happiness and, above all, best interests— concepts that are firmly rooted in child custody analyses.
Discussion
Whatever one may think of treating our dogs like people— whether it is called “humanification,” “personhood,” or some other means of endowing dogs with humanlike qualities — it is impossible to deny the place they have in our hearts, minds and imaginations. From Odysseus’s ever-faithful dog Argo in Homer’s The Odyssey, to the all-American collie Lassie, to the Jetsons’ futuristic canine Astro, to Dorothy’s little dog Toto too, they are beloved figures in literature, movies and television. And in real life, where would we be without St. Bernards and their casks of brandy in the Alps, Pavlov’s conditioned-response subjects, Balto the hero sled dog racing to the rescue in the Arctic, or, of course, the Nixon daughters’ little cocker spaniel Checkers?[1]
It is also obvious that dogs, and household pets in general, receive an ever increasing amount of our time, attention and money.[2] Where once a dog was considered a nice accompaniment to a family unit, it is now seen as an actual member of that family, vying for importance alongside children. The depth of this familial attachment is evidenced by statistics cited in Bones of Contention: Custody of Family Pets, which appeared in the 2006 Journal of the American Academy of Matrimonial Lawyers (Ann Hartwell Britton, Bones of Contention: Custody of Family Pets, 20 J Am Acad Matrim Law 1 [2006]). These statistics show *452 that 76% of pet owners feel guilty about leaving their pets at home, 73% have signed a greeting card “from the dog,” 67% take their pets to the veterinarian more often than they go to their own doctors, 41% take their dogs on vacation with them, and 38% telephone their pets so the animals can hear their voices when they are away. Perhaps even more striking is the article’s report that “[a] Gallup Poll showed most pet owners would not trade their pet for even $1 million in cash” (id. at 16).
While the dog owners of New York might uniformly regard their pets as being far more than mere property, the law of the State of New York is in many ways still largely at odds with that view. The prevailing law, which has been slow to evolve, is that, irrespective of how strongly people may feel, a dog is in fact personal property — sometimes referred to as “chattel”— just like a car or a table (see Mullaly v People, 86 NY 365 [1881]; Schrage v Hatzlacha Cab Corp., 13 AD3d 150 [1st Dept 2004]; Rowan v Sussdorff, 147 App Div 673 [2d Dept 1911]; ATM One, LLC v Albano, 2001 NY Slip Op 50103[U] [Nassau Dist Ct 2001]). This means that if a veterinarian negligently dispatches your treasured Yorkshire terrier, the most you can count on recovering as compensation is the animal’s fair market value (see Jason v Parks, 224 AD2d 494 [2d Dept 1996]). And unless your Yorkshire terrier was a purebred show dog, that fair market value, as opposed to sentimental value, will be relatively small no matter how wonderful the dog was or how heartbroken and traumatized your family is by its loss (see Smith v Palace Transp. Co., Inc., 142 Misc 93 [NY Mun Ct 1931] [a fox terrier]; Mercurio v Weber, 2003 NY Slip Op 51036[U] [Nassau Dist Ct 2003] [Dexter and Bentley, Yorkshire terriers]). Similarly, if that same veterinarian successfully treats the dog but for some reason refuses to return it, your remedy is to bring an action for replevin — the same remedy you would have if an automobile mechanic refused to return your Volvo or your Ford (see Merriam v Johnson, 116 App Div 336 [1st Dept 1906]).
Replevin is the means by which non-matrimonial actions regarding ownership and possession of dogs have generally come before New York courts (see e.g. LeConte v Lee, 35 Misc 3d 286 [Civ Ct, NY County 2011] [Bubkas, a maltese]; Webb v Papaspiridakos, 23 Misc 3d 1136[A], 2009 NY Slip Op 51152[U] [Sup Ct, Queens County 2009] [Precious, a Jack Russell terrier]; Saunders v Regeer, 50 Misc 2d 850 [Suffolk Dist Ct 1966] [Misty, an Irish setter]; see also Central Westchester Humane *453 Socy., Inc. v Hilleboe, 202 Misc 881, 884 [Sup Ct, Westchester County 1952] [discussing the value of dogs in general and an owner’s property rights in them]; Mongelli v Cabral, 166 Misc 2d 240 [Yonkers City Ct 1995] [small claims action over Peaches, a Molluccan cockatoo]). With the standard for replevin being “superior possessory right in the chattel” (Pivar v Graduate School of Figurative Art of N.Y. Academy of Art, 290 AD2d 212, 213 [1st Dept 2002]), it is the property rights of the litigants, rather than their respective abilities to care for the dog or their emotional ties to it, that are ultimately determinative.
Even in the one reported case where a New York court awarded temporary possession of a pet in the context of a divorce proceeding, C.R.S. v T.K.S. (192 Misc 2d 547, 547, 550 [Sup Ct, NY County 2002]), the award to the wife of the couple’s “five-year-old chocolate labrador retriever” was based solely on the fact that the dog was an “interspousal gift” to her. Any doubt that the court in C.R.S. was utilizing a strict property analysis in its granting of temporary possession is confirmed by the direction in the decision that “[t]he determination of the final distributive award of the dog will be made at trial. A credit for any proven value of the dog could be made at that time” (id. at 549-550). The clear implication is that the Labrador retriever was to be “distributed” just like any other item of marital property subject to equitable distribution, be it a television or a set of dishes.[3]
Nevertheless, at the same time that the traditional property view has continued to hold sway, there has been a slow but steady move in New York case law away from looking at dogs and other household pets in what may be seen as an overly reductionist and utilitarian manner. One of the first of these cases, Corso v Crawford Dog & Cat Hosp. (97 Misc 2d 530 [Civ Ct, Queens County 1979]), involved a veterinarian who wrongfully disposed of the remains of the plaintiff’s poodle and then attempted to conceal the fact by putting the body of a dead cat in the dog’s casket. Finding that the distressed and anguished plaintiff was entitled to recover damages beyond the market value of the dog, the court held that “a pet is not just a thing but occupies a special place somewhere in between a person and a piece of personal property” (id. at 531).
*454 In this same vein, the Appellate Division, Second Department, in a 2008 case brought by a cat owner against an animal shelter, cited the extensive array of laws that exist in New York for the protection of pets (Feger v Warwick Animal Shelter, 59 AD3d 68 [2d Dept 2008]). The Court, after observing that “[t]he reach of our laws has been extended to animals in areas which were once reserved only for people,” went on to underscore that “[t]hese laws indicate that companion animals are treated differently from other forms of property. Recognizing companion animals as a special category of property is consistent with the laws of the State” (id. at 72).
Courts in other states have also had occasion to deviate from the strict pets-equal-property viewpoint to find that household pets have a special status surpassing ordinary personalty or chattel. In a widely-cited decision involving a mixed-breed dog, “Boy,” the Vermont Supreme Court, drawing on Corso’s statement that a pet is “somewhere in between a person and a piece of personal property,” noted that “modern courts have recognized that pets generally do not fit neatly within traditional property law principles” (Morgan v Kroupa, 167 Vt 99, 103, 702 A2d 630, 633 [1997]).
Likewise, the Wisconsin Supreme Court in Rabideau v City of Racine (243 Wis 2d 486, 491, 627 NW2d, 795, 798 [2001] [footnotes omitted]), stated the following:
“[W]e are uncomfortable with the law’s cold characterization of a dog ... as mere ‘property.’ Labeling a dog ‘property’ fails to describe the value human beings place upon the companionship that they enjoy with a dog. A companion dog is not a fungible item, equivalent to other items of personal property” (see also Juelfs v Gough, 41 P3d 593, 594 [Alaska 2002] [in a “custody” battle over Coho, a chocolate Labrador retriever, giving some credence to the ex-wife’s claim that “a pet is not just a thing”]; Bueckner v Hamel, 886 SW2d 368, 377-378 [Tex Ct App 1994] [Freckles, a one-year-old Dalmatian, and Muffin, a two-year-old Australian shepherd; “Society has long since moved beyond the untenable Cartesian view that animals are unfeeling automatons and, hence, mere property”], writ denied [1995]; Goodby v Vetpharm, Inc., 182 Vt 648, 927 A2d 792 [2007] [“Pets may be distinguished from other chattel by the mutual relationship: Pet *455 owners love their pets and their pets love them back”]).
It is from this state though, and from the First Department in particular, that we have one of the most important statements from a “modern court” as to the “de-chattelization” of household pets. The case Raymond v Lachmann (264 AD2d 340 [1st Dept 1999]) is certainly the most relevant to the inquiry as to how a court should best proceed when dealing with a dispute like the one over Joey. In Raymond, the Court was called upon to resolve the issue of who was entitled to “ownership and possession of the subject cat, Lovey, nee Merlin.”[4] In a short, poignant opinion, the Court wrote:
“Cognizant of the cherished status accorded to pets in our society, the strong emotions engendered by disputes of this nature, and the limited ability of the courts to resolve them satisfactorily, on the record presented, we think it best for all concerned that, given his limited life expectancy, Lovey, who is now almost ten years old, remain where he has lived, prospered, loved and been loved for the past four years” (id. at 341).
Raymond is significant for both what it does and does not do. The decision is a clear statement that the concept of a household pet like Lovey being mere property is outmoded. Consequently, it employs a new perspective for determining possession and ownership of a pet, one that differs radically from the traditional property analysis. This new view takes into consideration, and gives paramount importance to, the intangible, highly subjective factors that are called into play when a cherished pet is the property at issue. The factors touched upon in the decision include the concern for Lovey’s well-being as an elderly cat and the special relationship that existed between him and the person with whom he was living, a relationship that is described, rather nicely, as one where Lovey has “loved and been loved.” In making its determination to keep Lovey in his present home, the First Department apparently concluded that the intangibles *456 transcended the ordinary indicia of actual ownership or right to possession such as title, purchase, gift, and the like.
After reviewing the progression of the law in both New York and other states, it can be concluded that in a case such as this, where two spouses are battling over a dog they once possessed and raised together, a strict property analysis is neither desirable nor appropriate. Although Joey the miniature dachshund is not a human being and cannot be treated as such, he is decidedly more than a piece of property, marital or otherwise. As a result, whether plaintiff bought Joey from the pet store with her own funds or whether defendant received him from plaintiff as a gift is only one factor to consider when determining what becomes of him.
But if not a strict property analysis, what should be the process by which Joey’s fate is decided and what standard should be applied in making that determination? Should the court adopt a custody analysis similar to that used for child custody? And if so, is the well-established standard of “best interests of the child” to be replaced by that of “best interests of the canine?”
Because of the paucity of New York case law addressing these matters, it is useful to turn once again to decisions from the courts of other states. There are a small number of cases that actually use the term “custody” in making an award of a dog to a spouse or ex-spouse (see e.g. Juelfs, 41 P3d 593 [granting “sole custody” of Coho the chocolate Labrador retriever to ex-husband]; Van Arsdale v Van Arsdale, 2013 WL 1365358, *4 [2013], 2013 Conn Super LEXIS 574, *10 [“The parties shall have joint legal custody of the labrador retrievers but the labrador retrievers’ principal place of residence shall be with the plaintiff’]). One decision, Placey v Placey (51 So 3d 374 [Ala Ct Civ App 2010]), in which the court relied on an Alabama animal protection statute in awarding “a dog named Preston” to one family member over another, goes so far as to expressly refer to the “best interest” of the dog.
The majority of cases from other jurisdictions, however, have declined to extend child custody precepts to dog disputes. Some have been plainly dismissive (see e.g. Desanctis v Pritchard, 803 A2d 230, 232 [Pa Super Ct 2002] [shared custody of a dog, Barney, not permissible because he is personal property and as such, said arrangement would be “analogous, in law, to (custody of) a table or a lamp”]). Particularly notable is the language used in Clark v McGinnis (298 P3d 1137 [Kan Ct App 2013] *457 [table; text at 2013 WL 1444421, 2013 Kan App Unpub LEXIS 305]). There, the Kansas Court of Appeals declined to award the appellant “custody” of Dinky, one of the parties’ three dogs. In holding that the “argument that child custody laws should be applied to dogs is a flawed argument,” the court observed, with the classic midwestern gift for stating the obvious, that “[o]ne relevant difference between children and dogs is that children are human beings and dogs are domestic animals” (2013 WL 1444421, *2; 2013 Kan App Unpub LEXIS 305, *7).
Still, there is a good body of case law from other states that, while not embracing the application of child custody principles to cases of dog ownership and possession, takes a nuanced position that considers at least some of the factors traditionally associated with child custody (see e.g. Baggett v Baggett, 2013 WL 4606383, *12, 2013 Tenn App LEXIS 550, *33 [2013] [“As to ownership of the parties’ dogs, it is evident that the trial court considered their needs and the ability of the parties to care for them”]; Aho v Aho, 2012 WL 5235982, *5, 2012 Mich App LEXIS 2104, *15 [2012] [“(T)he trial court found that awarding Finn (the dog) to plaintiff was proper in order to keep all of the animals together”]; see also Wolfv Taylor, 224 Or App 245, 250, 197 P3d 585, 587 [2008] [while not directly addressing issue of whether agreement regarding visitation of a dog is enforceable, positing that it “certainly is an interesting question”]).
With the exception of Placey, the Alabama case, even the decisions employing custody or custody-like considerations to dog disputes have uniformly rejected the application of a “best interests” standard. As the Vermont Supreme Court stated in Morgan, a case pitting the former owner of a lost dog against its finder: “[T]he trial court was correct that family law provides an imperfect analogue. However strong the emotional attachments between pets and humans, courts simply cannot evaluate the ‘best interests’ of an animal” (167 Vt at 103, 702 A2d at 633). Similarly, in Houseman v Dare (405 NJ Super 538, 544, 966 A2d 24, 28 [2009]), a case in which former fiancés ended their engagement but proceeded to remain tied to one another through extensive litigation over their dog, the court acknowledged that “sincere affection for and attachment to” a pet is a special subjective value that needs to be considered “in resolving questions about possession.” But the New Jersey court, quoting Morgan with respect to a court’s inability to evaluate an animal’s best interests, stated: “We are less confident that there are judicially discoverable and manageable standards for *458 resolving questions of possession from the perspective of a pet, at least apart from cases involving abuse or neglect contrary to public policies expressed in laws designed to protect animals” (405 NJ Super at 545, 966 A2d at 28).
Although the opinion by the First Department in Raymond can be read as a firm declaration that household pets enjoy a status greater than mere chattel, the decision, irrespective of its use of language that is in some ways suggestive of a child custody, does not direct that the resolution of a pet dispute be undertaken by engaging in a process comparable to a child custody proceeding. Nor does it state that a court should utilize a best interests standard in determining to whom the pet should be awarded. In fact, the term “best interests” appears nowhere in the decision. Instead, the term that is used is “best for all concerned” (264 AD2d at 341). Thus, when the parties here cite Raymond for the proposition that Joey’s “best interests” must be considered in determining their competing claims for him, the citation is inapposite (see Dubin v Pelletier, 2012 WL 5983184, 2012 RI Super LEXIS 175, *1, *64 [2012] [in determining possession of a Norfolk terrier “fondly referred to as ‘Mr. Big,’ ” citing Raymond for its standard of “best for all concerned,” but noting that the Raymond court was “not engaging in a best interests analysis”]).[5]
Child custody battles are difficult, painful and emotionally wrenching experiences for all concerned: the parties, the children, the attorneys and the court. The New York State Court of Appeals, in writing about one facet of child custody, relocation, could have been describing custody cases in general when it stated that such cases “present some of the knottiest and most disturbing problems that our courts are called upon to resolve” (Matter of Tropea v Tropea, 87 NY2d 727, 736 [1996]). A determination in a custody proceeding must be guided by the overriding and well established standard of the child’s best interests (Eschbach v Eschbach, 56 NY2d 167 [1982]; see also Zafran v *459 Zafran, 306 AD2d 468, 469 [2d Dept 2003] [“In child custody determinations, a court must decide what is in the best interest of the child, and what will promote his or her welfare and happiness”]). A court needs a tremendous amount of information upon which to make a best interests finding. This almost always necessitates the appointment of an attorney for the children; the appointment of a forensic psychiatrist or psychologist to evaluate the children and the parties as well as to conduct collateral interviews with teachers, child care providers, pediatricians and the like; the taking of extended testimony, both from lay and expert witnesses; and the court hearing from the children themselves in an in camera proceeding.
Obviously, the wholesale application of the practices and principles associated with child custody cases to dog custody cases is unworkable and unwarranted. As has been noted in decisions previously cited, it is impossible to truly determine what is in a dog’s best interests. Short of the type of experimental canine MRIs discussed in the New York Times piece Dogs are People, Too, there is no proven or practical means of gauging a dog’s happiness or its feelings about a person or a place other than, perhaps, resorting to the entirely unscientific method of watching its tail wag. The subjective factors that are key to a best interests analysis in child custody — particularly those concerning a child’s feelings or perceptions as evidenced by statements, conduct and forensic evaluations — are, for the most part, unascertainable when the subject is an animal rather than a human.
Even if there were a method to readily ascertain in some meaningful manner how a dog feels, and even if a finding could be made with regard to a dog’s best interests, it is highly questionable whether significant resources should be expended and substantial time spent on such endeavors. It is no secret that our courts are overwhelmed with child custody cases, cases in which the happiness and welfare of our most precious commodity, children, are at stake. To allow full-blown dog custody cases, complete with canine forensics and attorneys representing not only the parties but the dog itself, would further burden the courts to the detriment of children. Such a drain of judicial resources is unthinkable.
This does not mean, however, that cases like this one, in which it appears that each spouse views the dog as a family member and sincerely believes that he would be better off in her care, should be given short shrift. After all, matrimonial judges spend *460 countless hours on other disputes that do not rise to a level of importance anywhere near that of children. If judicial resources can be devoted to such matters as which party gets to use the Escalade as opposed to the Ferrari, or who gets to stay in the Hamptons house instead of the Aspen chalet, there is certainly room to give real consideration to a case involving a treasured pet.
With this in mind, it is appropriate that the parties here be given a full hearing. Full does not mean extended; the hearing shall not exceed one day. The standard to be applied will be what is “best for all concerned,” the standard utilized in Raymond. In accordance with that standard, each side will have the opportunity to prove not only why she will benefit from having Joey in her life but why Joey has a better chance of living, prospering, loving and being loved in the care of one spouse as opposed to the other. To this end, the parties may need to address questions like: Who bore the major responsibility for meeting Joey’s needs (i.e., feeding, walking, grooming and taking him to the veterinarian) when the parties lived together? Who spent more time with Joey on a regular basis? Why did plaintiff leave Joey with defendant, as defendant alleges, at the time the couple separated? And perhaps most importantly, why has defendant chosen to have Joey live with her mother in Maine, rather than with her, or with plaintiff for that matter, in New York?
At this juncture, it should be made clear that, absent an appeal, the one-day hearing to determine who gets Joey will be the final proceeding on this issue. The award of possession will be unqualified. This means that whichever spouse is awarded Joey will have sole possession of him to the complete exclusion of the other. Although regrettably a harsh and seemingly unfeeling outcome, it is the only one that makes sense. As has been stated, our judicial system cannot extend to dog owners the same time and resources that parents are entitled to in child custody proceedings. The extension of an award of possession of a dog to include visitation or joint custody — components of child custody designed to keep both parents firmly involved in the child’s life — would only serve as an invitation for endless post-divorce litigation, keeping the parties needlessly tied to one another and to the court (see Prim, v Fisher, 2009 WL 6465236, 2009 Vt Super LEXIS 19, *7 [2009] [“Judicial economy would not be served by overseeing joint custody of a pet” golden retriever named Kaos]; Juelfs, 41 P3d at 597 [“(T)he parties *461 were unable to share custody of Coho without severe contention”]).[6] While children are important enough to merit endless litigation, as unfortunate as that litigation may be, dogs, as wonderful as they are, simply do not rise to the same level of importance.
Conclusion
The changes in the way society regards dogs and other household pets all but insure that cases involving the type of dispute seen here will only increase in frequency. In Raymond, the First Department referred to “the limited ability of the courts to resolve” such cases (264 AD2d at 341). It is my hope that the analysis engaged in here, including the survey of cases from both New York and other states, will help other courts more successfully deal with the conflict that ensues when a couple separates, a marriage ends, and a Joey, an Otis, a Bubkas, or a Lovey is left in the wake.
In accordance with the foregoing, plaintiffs motion is granted to the extent of setting the case down for a hearing to determine who shall have final possession of the dog, Joey.

. Full disclosure: I own a dog, a rescued pit bull mix named Peaches. She is loving, loyal and kind, and at age 12 is still able to leap tall buildings in a single bound in order to catch a frisbee.

. According to The Atlantic, Americans spent $52 billion on their pets in 2012 (Derek Thompson, theatlantic.com, These 4 Charts Explain Exactly How Americans Spend $52 Billion on Our Pets in a Year, http://www.theatlantic. com/business/archive/2013/02/these-4-charts-explain-exactly-how-americansspend-52-billion-on-our-pets-in-a-year/273446/ [Feb. 23, 2013]). This sum, which is greater than the gross national product of Bulgaria, is twice the annual amount we spent on our pets 20 years ago.

. That the judge in C.R.S. was none too pleased with having to deal with a dog is made obvious by her comment: “The court notes that the time and money expended litigating this issue could have been used to negotiate and fund a settlement” (id. at 550).

. Because the case before me is about a dog, this decision, with the exception of one cited case concerning a bird, has largely focused on dogs. Yet, it must be acknowledged that cats, for reasons that might be hard to fathom by dog owners, also play an important role in our lives as companion pets. And even though cats are far less visible in this city, as they neither walk on leashes — usually—nor play in dog runs, they are clearly experiencing a wave of popularity not equaled since ancient Egypt, when their hieroglyphic images adorned obelisks and tombs.

. Two of the New York cases previously cited, Feger and LeConte, attribute a best interests standard to Raymond. Like the parties here, the courts in the two cases apparently confused the decision’s use of the term “best for all concerned” with the more familiar term “best interests.” It should be recognized that the court in LeConte nonetheless engaged in a thoughtful analysis of matters bearing on the well-being of the dog Bubkas before ultimately finding that the plaintiff had a “superior possessory right” and was thus “entitled to the return of his canine companion” (LeConte, 35 Misc 3d at 288). As a result, it might be said that the plaintiff got Bubkas and the defendant got nothing.

. Although courts should not entertain applications for “joint custody or visitation” with regard to a pet, the parties are, of course, always free, and in fact are encouraged, to informally make their own arrangements (see LeConte, 35 Misc 3d 286, 288 [“While there is no legal obligation to do so, the court hopes the parties will find a way for Bubkas to continue to spend time with both parties”]). These arrangements, however, cannot be judicially sanctioned by way of a “so ordered” stipulation or agreement, and they will not be enforceable in a postjudgment or any form of court proceeding.