Connolly v Nina (2024 NY Slip Op 51422(U))

[*1]

Connolly v Nina

2024 NY Slip Op 51422(U)

Decided on October 15, 2024

Supreme Court, Kings County

Maslow, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected in part through October 21, 2024; it will not be published in the printed Offical Reports.

Decided on October 15, 2024
Supreme Court, Kings County

Debrasue Connolly, Plaintiff,

against
Venessa Nina, Defendant.

Index No. 526/2024

Debrasue Connolly, plaintiff pro se.
Venessa Nina, defendant pro se.

Aaron D. Maslow, J.

Papers used on this motion: order to show case, petition with verification, affidavit of emergency, Part 130 certification, affidavit in support of notification, and attached exhibits; request for judicial intervention; poor person order and affidavit in support; interim orders; plaintiff's and defendant's hearing exhibits; transcripts, July 5, 2024, July 12, 2024, July 18, 2024.
 Introduction
This case involves a dispute over the ownership and custody of two dogs, Mary Alice, an approximately 12-year-old tan puggle,[FN1]
and Henry, a five-year-old white chihuahua with patches of black, who are depicted at 
https://nycourts.gov/reporter/webdocs/ConnollyvNina_Image1.pdf.[FN2]

Plaintiff and Defendant both assert strong claims to the dogs, citing ownership, emotional bonds, financial contributions, and caregiving responsibilities. In adjudicating this matter, this Court applies the "best for all concerned" standard established in Raymond v Lachmann (264 AD2d 340, 341 [1st Dept 1999] [cat to remain where he lived, prospered, loved, and was loved given his age and limited life expectancy], a seminal appellate decision not applying pure ownership as the standard for custody of a pet).
Plaintiff Debrasue Connolly adopted Mary Alice in September 2019 (see July 12, 2024 tr at 6, lines 18-20; plaintiff's exhibit 7) and Henry in 2020 (see plaintiff's exhibit 6). Over the last [*2]few years, on various occasions, including when Plaintiff has been hospitalized, she entrusted the dogs to Defendant Venessa Nina, a professional pet caretaker (see July 5, 2024 tr at 6, line 1; 12, lines 13-15; 14, lines 24, through 15, line 8; 14, line 24, through 15, line 8; 19, line 19, through 20, line 2; 23, lines 11-18; July 12, 2024 tr at 37, lines 3-5; 30, lines 22-23). She first engaged Defendant, an animal caregiver who offers dog walking, boarding, and training services, as a pet sitter in May 2020 (see July 5, 2024 tr at 9, lines 17-18) or "toward the end of 2019 or the beginning of 2020" (id. at 14, line 25, through 15, line 1). Defendant has a New York City Department of Health dog handler certification and received a qualifying certificate of animal care and handling also (see July 18, 2024 tr at 28, lines 2-6).
On October 14, 2023, with Mary Alice and Henry accompanying her, Plaintiff trekked out from Manhattan to the beach in Long Beach, Long Island, fell asleep there, and awoke to find her pocketbook and phone gone as well as Henry being in the custody of the local animal control. Animal control called Defendant — not Plaintiff — to retrieve Henry and Mary Alice because Defendant's information was linked to the implanted microchips. Defendant alleged that the microchips were in her name by request due to the frequency of Plaintiff's unanticipated hospitalizations, leading to the dogs' being sent to the pound each time. On previous occasions, Defendant returned the dogs to Plaintiff after having taken care of them for her. Following this incident, however, Defendant elected to maintain custody of the dogs after the shelter allegedly informed her that she would be charged with animal neglect and cruelty should she again yield possession of them to Plaintiff. Plaintiff consequently commenced a pro se suit against Defendant to recover custody of the dogs. (See generally July 5, 2024 tr at 2-15.)
Plaintiff seeks the return of both dogs but would be amenable to the return of Mary Alice only as she feels she is best suited to care for Mary Alice's conditions, including "cherry eye," as well as from bowleggedness. Although Plaintiff claims lawful ownership, she focused on Mary Alice's safety, arguing that Defendant's care was wholly inadequate. Plaintiff asserted Defendant was abusing Mary Alice by taking her on long walks as she has little stamina, bringing her to dog parks as Mary Alice allegedly cannot be around big dogs, allowing Mary Alice to be around Defendant's cats, administering home remedies for Mary Alice's cherry eye condition, and harming Mary Alice with CBD biscuits. Defendant, however, argued that the dogs should not be returned due to unsanitary living conditions in Plaintiff's apartment, the dogs being filthy when living with Plaintiff, the frequency of Plaintiff's sudden absences, the length of these absences, concerns for the safety of the dogs as Plaintiff heavily relied on Defendant to care for them during the absences, Plaintiff's failure to socialize the dogs, Defendant's exposure to prosecution by animal care and control officials if she released the dogs to Plaintiff, and the dogs being microchipped to Defendant. In any event, the dogs are bonded and should not be separated, maintained Defendant. (See generally id. at 13-27.)
The parties attended three evidentiary hearings, on July 5, 12, and 18 of 2024, during which they both provided testimony and documentary evidence regarding their relationship with the dogs. Evidence presented included, among other things, dog licensing documents, microchip confirmations, veterinary records, letters of reference from acquaintances, text messages between Defendant and animal rescue center staff, voicemails Plaintiff sent to Defendant, personal financial records, and photos.[FN3]

Procedural Background
This action was commenced by a pro se Plaintiff against a pro se Defendant. Plaintiff's [*3]documents did not properly commence the action under New York law, as Plaintiff initiated this matter by filing an order to show cause dated June 27, 2024, a petition, an affidavit of emergency, and various exhibits.[FN4]
In New York, an action can be commenced in one of three ways: (1) by filing a summons and complaint; (2) by filing a summons with notice; or (3) by filing a summons with notice of motion for summary judgment and supporting papers in lieu of a complaint (see CPLR 304, 3213). Plaintiff did not utilize any of these methods. Additionally, Plaintiff did not cite any statutory provision that would allow her to bring a claim for the return of her dogs within a special proceeding, which is a type of expedited lawsuit commenced with a petition (see CPLR 103 [b], 402).
There was no question regarding jurisdiction as Defendant was properly served. Defendant appeared and contested Plaintiff's claim on the merits. However, given the irregular nature of the papers that commenced this action, the Court elected to treat the documents as the equivalent of a summons and complaint combined with a motion for summary judgment (see CPLR 103 [c]). Under Judiciary Law § 2-b (3), "A court of record has power . . . (3) to devise and make new process and forms of proceedings, necessary to carry into effect the powers and jurisdiction possessed by it." Further, under CPLR 2101 (f), "A defect in the form of a paper, if a substantial right of a party is not prejudiced, shall be disregarded by the court and leave to correct shall be freely given." Courts thereby may exercise flexibility in matters such as this where Plaintiff sought replevin — the return of her dogs — which requires proper commencement of an action. The Court deemed the argument and testimony adduced to be within the context of a hearing on Plaintiff's motion for summary judgment (see July 12, 2024 tr at 7, lines 9-11).[FN5]

Summary judgment is a drastic remedy that should be granted only if no triable issues of fact exist and the movant is entitled to judgment as a matter of law (see Alvarez v Prospect Hosp., 68 NY2d 320 [1986]; Andre v Pomeroy, 35 NY2d 361 [1974]). Although typically decided on the papers, under CPLR 3212 (c), "if it appears that the only triable issues of fact arising on a motion for summary judgment relate to the amount or extent of damages . . . the court may, when appropriate for the expeditious disposition of the controversy, order an immediate trial of such issues of fact raised by the motion. . . ." While this case does not involve damages, the Court opted for an expedited resolution. Both parties did not object to having a trial in this manner, thereby avoiding the lengthy process of discovery and potential delay from placement on a trial calendar.[FN6]
Consequently, the Court held an evidentiary hearing over the course of three days in July to resolve the issue of custody of the dogs. The Court also found support for proceeding in this manner in CPLR 2218, which provides in pertinent part, "The court may order that an issue of fact raised on a motion shall be separately tried by the court or a referee," as well as in the previously-cited Judiciary Law § 2-b (3) provision, "A court of record has power . . . (3) to devise and make new process and forms of proceedings, necessary to carry into effect the powers and jurisdiction possessed by it."

Legal Standard
Traditionally, New York courts viewed pets as personal property, resolving ownership disputes based on which party held the superior possessory right (see Travis v Murray, 42 Misc 3d 447, 452-453 [Sup Ct, NY County 2013]). More recently, however, courts recognized the myriad of ways in which companion animals are recognized as much more to their owners than simple possessions (see Pron v Tymshan, 79 Misc 3d 1235[A], 2023 NY Slip Op 50809[U] [Civ Ct, NY County 2023]). Courts now treat companion animals as a special category of property, which is consistent with underlying public policy to protect the welfare of animals (see Mitchell v Snider, 51 Misc 3d 1229[A], 2016 NY Slip Op 50877[U] [Civ Ct, NY County 2016]).
Courts have increasingly applied Raymond's "best for all concerned" analysis, balancing a strict property analysis with the more extensive interests analysis involved in child custody cases (see Pron, 2023 NY Slip Op 50809[U], *4). The "best for all concerned" standard combines traditional property elements and intangible or subjective factors involved in custody, such as the emotional bond between the pet and its caretakers, the ability to meet the pet's physical and emotional needs, and the stability and consistency of care provided (see id.; L.B. v C.C.B., 77 Misc 3d 429 [Sup Ct, Kings County 2022]; Mundo v Weatherson, 74 Misc 3d 1215[A], 2022 NY Slip Op 50125[U] [Civ Ct, NY County 2022]). "Relevant facts include those that reflect each party's ability to meet the animal's physical and emotional needs, including financial circumstances, access to outdoor activities, opportunities for exercise and socialization, access to veterinary care and necessary supplies, and the time required to meet these needs on a daily basis" (Pron, 2023 NY Slip Op 50809[U], *4). Modern day notions concerning disputed custody of pets led our state's legislature to amend the Domestic Relations Law to mandate that when dividing marital property, "in awarding the possession of a companion animal, the court shall consider the best interest of such animal" (Domestic Relations Law § 236 [B] [5] [d] [15]).
In Raymond, the Court determined the custody of a cat. In light of the cat's age and the strong bond between the animal and its caregiver, the Court found that the cat should remain where it had "lived, prospered, loved and been loved for the past four years" (Raymond, 264 AD2d at 341). In Hennet v Allan (43 Misc 3d 542 [Sup Ct, Albany County 2014]), the Court examined which party had a more genuine right of possession based on their conduct in acquiring and caring for the dog. This required consideration of the parties' relationship with the dog and how care was arranged after one party left their shared home (see Hennet, 43 Misc 3d at 548).
"Although nonhuman animals are not 'persons' to whom the writ of habeas corpus applies, the law already recognizes that they are not the equivalent of 'things' or 'objects.' Unquestionably, nonhuman animals are sentient beings that, albeit without liberty rights, have been afforded many special protections by the New York Legislature—long considered a leader in animal welfare." (Nonhuman Rights Project, Inc. v Breheny, 38 NY3d 555, 575-576 [2022].) After reciting a plethora of New York statutes protecting the interests of animals, including the aforecited Domestic Relations Law provision, the Court of Appeals noted, "As the foregoing statutes demonstrate, New York law acknowledges that the relationships between humans and nonhuman animals are varied and complex and, in many contexts, the law clearly imposes a duty on humans to treat nonhuman animals with dignity and respect" (id. at 576).
In line with the "best for all concerned" approach and the Court of Appeals' declaration that animals are not mere things or objects, this Court assesses not just the parties' possessory rights but also intangible factors based on each party's ability to meet the dogs' physical and emotional needs. Considering the evidence presented by the parties, this Court focuses on financial circumstances, the competing living environments, access to outdoor activities, opportunities for exercise and socialization, access to veterinary care and necessary medical supplements, the time required to meet these needs on a daily basis, and why each party would benefit from having the dogs in their life (see Pron, 2023 NY Slip Op 50809[U], *4; Mitchell, 2016 NY Slip Op 50877, *3).

Discussion

 I. Claims of Ownership
Both parties presented documentation supporting their claims of ownership. Plaintiff testified that Mary Alice and Henry were adopted in her name and are registered under her ownership with New York City health authorities (see July 5, 2024 tr at 8, lines 11-18; plaintiff's exhibit 4). Medical records submitted by Plaintiff listed her as the "owner" (see plaintiff's exhibits 5, 6), and Plaintiff also claimed to have microchipped the dogs (see July 5, 2024 tr at 17, line 25, through 18, line 1; plaintiff's exhibit 2).
Defendant, however, had licensed the dogs at a certain point (see id. at 13, lines 11-13; defendant's exhibit A). She provided documents from 24Petwatch, a registration site for pet microchips, stating that the dogs were microchipped to her, and submitted text messages from Posh Pets Rescue identifying her as the legal owner (see id. tr at 13, lines 7-11; 14, lines 1-7; defendant's exhibits D, E). She submitted animal redemption forms (see defendant's exhibit A) and reunification forms (see defendant's exhibit F). "These are my dogs, and if they go back into her care and something happens to them, I'm responsible," testified Defendant (July 5, 2024 tr at 16, lines 12-14).
Given the contradictory records, the Court finds that traditional markers of ownership are non-dispositive as both parties have strong claims to ownership of Mary Alice and Henry.

II. Financial Capacity to Provide for the Dogs
Plaintiff claimed her financial resources are a significant factor in her ability to care for Mary Alice and Henry. Access to a trust fund left to Plaintiff by her father facilitates the ability to afford premium dog food and veterinary care (see July 12, 2024 tr at 41, lines 22-25; July 18, 2024 tr at 35, lines 2-23), but Plaintiff also revealed that the trust administrator has at times denied or delayed requests for payments (see July 18, 2024 tr at 34-37, 46-47). "They pay my bills but it's very difficult to get them to pay anything so I'm having difficulty with them" (id. at 35, lines 9-11). The trust is labeled a special needs one and it succeeded Plaintiff's sister as trustee after the sister resigned, by order of the Surrogate's Court (see id. at 36, lines 4-5, 41, line 10, through 42, line 14).
Although Plaintiff paid the dogs' medical and general expenses, Defendant also demonstrated that she consistently covered the dogs' daily expenses while in her care. Defendant asserted that she provides food, shelter, and medical treatments using her own funds (see July 5, 2024 tr at 22, lines 13-25; July 12, 2024 tr at 40, lines 6-10, 20-21). Overall, this factor tips narrowly in favor of Defendant, whose access to funds necessary for the dogs' care is not limited [*4]by a third party. Were Plaintiff's trustee to be more accommodating, her access to a trust containing around $500,000 (see July 18, 2024 tr at 35, line 23) would militate in favor of Plaintiff in terms of financial capability.

III. Emotional Bond, Caregiving, and Pet Life
Both parties share a deep emotional bond with the dogs, as evidenced by testimony regarding their personal relationships with Mary Alice and Henry. Clearly, Mary Alice and Henry served as emotional companions for Plaintiff. "They are my babies. I love them so much. This has devastated me. All I do is pace and drink water" (July 12, 2024 tr at 31, lines 3-5), was but one of Plaintiff's numerous expressions of affection for the dogs.
The following testimony encapsulates Plaintiff's feelings toward Mary Alice:
Mary Alice is a dog who came from a history of torture. And I've taken her to two specialists. I don't know if you had a chance to review the records that I submitted last week. She has dry eye. She's on her way to being blind in both eyes. She needs to go to the vet immediately for both her eyes and her legs. I applaud Venessa for getting the carriage but she shouldn't need a carriage if she's being taken care of well. She could still walk well. She is my emotional support dog. She is my baby. Please, she brings me so much joy. (July 18, 2024 tr at 40, lines 9-19.)
I love my dogs. And I will take wonderful care of them if you hopefully decide to return them to me (July 5, 2024 tr at 19, lines 2-3).
Several of Plaintiff's acquaintances also provided letters in support, praising her care for the dogs and expressing confidence in her love for animals (see plaintiff's exhibit 8). A friend mentioned that Plaintiff "took wonderful care of her dogs," while another felt that the loss of the dogs has been a source of distress for Plaintiff and that getting the dogs back is important to restore her joy in life (see id.). Notably, Turhan Moody, LMHC, who worked with Plaintiff in the Bronx II Intense Medical Treatment Program, described Plaintiff's love and dedication to her pets as unquestionable (see July 18, 2024 tr at 54-56; Plaintiff's exhibit J). Plaintiff also submitted a letter from a member of her health team recommending the assistance of emotional support animals to help manage her anxiety and depression (see July 18, 2024 tr at 54-56; plaintiff's exhibit J).
Defendant maintained that she provided daily care for the dogs for the times when Plaintiff was unable to do so either due to hospitalization, health crises, or other reasons (see July 5, 2024 tr at 6, line 1; 12, lines 13-15; 14, line 24, through 15, line 8; 19, line 19 through 20, line 2; 23, lines 11-18; July 12, 2024 tr at 30, lines 22-23; 37, lines 3-5).[FN7]

Photos of Mary Alice and Henry playing with other neighborhood dogs as well as photos of them lying beside Defendant's cats suggest the dogs are well-adjusted in her care and comfortable in their current environment (see defendant's exhibits G11,[FN8]
G42)[FN9]: 
https://nycourts.gov/reporter/webdocs/ConnollyvNina_Image2.pdf [*5]
Neighborhood residents and shopkeepers enjoy holding or being with Henry (see defendant's exhibits G44, G7, G43),[FN10]
a product of Defendant's providing Henry with an active lifestyle: 
https://nycourts.gov/reporter/webdocs/ConnollyvNina_Image3.pdf
The Court credits the testimony of Defendant concerning the circumstances under which the middle photo above was taken and notes how keeping Henry in the local community benefits others who might not otherwise be exposed to human-canine interaction, thus fostering the universal precept of showing kindness to animals:
I live in Williamsburg with a lot of Hasidic Jews, and the children don't—usually are afraid of dogs. But my neighbor is one little boy who's very persistent that I let him pet. And I was like, as long as you're not going to get in trouble from your parents, sure, you could pet. He was very excited to pet Henry and hold him. So I thought snapping pictures, thought it was really cute and heartwarming. (July 18, 2024 tr at 14, line 24, through 15, line 6.)[FN11]
Additionally, and contrary to Plaintiff's belief that the dogs are fearful of and therefore should not be around large dogs (see July 12, 2024 tr at 23, lines 1-2; 31, lines 13-14), the photos depict Henry comfortably socializing and playing with other canines at the park — even standing on top of a large one (see id. at 35, lines 10-11; defendant's exhibits F1, F2, F3, F4, G19, G23, G24, G25, G33, G38).[FN12]
Mary Alice is also depicted as interacting with other dogs (see defendant's exhibits F1, F2, F3, F4, G18, G30, G33, G38). Socialization is as important for domesticated animals as it is for humans. One can readily observe from the photographic evidence that Mary Alice and Henry are afforded more of an opportunity to socialize and play with other dogs while under Defendant's care than they probably would be if they were sent back to Plaintiff:[FN13]
https://nycourts.gov/reporter/webdocs/ConnollyvNina_Image4.pdf
Plaintiff's assertion that Defendant is engaging in animal cruelty by taking Mary Alice to the dog park every day (see July 5, 2024 tr an 20, lines 19-24) is belied by the photographic evidence.
Defendant further established that she purchased winter clothes for the dogs (see id. at 8, lines 14-21; defendant's exhibits F5, G12, 13, 15) and transports them in a stroller as a precaution to protect from exacerbating Mary Alice's bowlegged condition (see July 18, 2024 tr at 26, lines 21-24; defendant's exhibit I).
It is apparent that both parties have time to spend with Mary Alice and Henry, although the Court is concerned with the fact that there have been lapses when Plaintiff was unable to care for them, which necessitated Defendant's services. Additionally, Plaintiff's trek out to Long Beach from Manhattan on the Long Island Rail Road with Henry and Mary Alice, about whom Plaintiff repeatedly expressed concern regarding her eye and orthopedic conditions, only to fall asleep on the beach without securing the dogs must be recognized as irresponsible behavior. This exposed them to unnecessary risks, as proven by Henry either wandering off or being dognapped when Plaintiff's phone was stolen.
During the hearings, Plaintiff repeatedly characterized Defendant in a pejorative manner, at one point claiming, "She's a violent, hateful individual" (July 18, 2024 tr at 6, line 7). "She's a violent person, she's an angry person" (id. at 6, lines 14-15). The Court finds no basis for these accusations. Additional charges that Defendant was "cruel to animals" (see July 18, 2024 tr at 28, line 15) is belied by the fact that various people have entrusted their pets to Defendant to walk, babysit, and otherwise care for them.
The Court acknowledges Plaintiff's emotional reliance on the dogs, particularly given her health condition and the distress she will incur should the dogs not be returned.[FN14]
However, the stability afforded the dogs in the course of Defendant's caregiving and the consistent positive experiences the dogs have had under her care tip this factor in her favor. Defendant's experience as a professional pet caregiver, dog walker, and trainer (on and off for 20 years) as well as her ability to provide emotional support and opportunities for Mary Alice and Henry to socialize and exercise regularly only speaks further to her stronger claim as the more superior caregiver.

 IV. Health and Medical Needs
Mary Alice's health is a point of contention between the parties, particularly regarding her cherry eye condition, as shown in the photo at right (defendant's exhibit G13). Plaintiff stressed that Mary Alice's cherry eye is chronic and requires daily treatments, including Refresh eye drops and Optix Care ointment, which she diligently administered (see July 12, 2024 tr at 42, lines 16-17). Markedly, Defendant alleged that Plaintiff never notified her of or provided instructions for these treatments, so she took the initiative to administer a home remedy, castor oil (see July 18, 2024 tr at 45, lines 10-14). Defendant further noted that she uses a dog stroller to prevent Mary Alice from overexerting herself on walks and provides CBD biscuits to alleviate joint pain (see id. at 24, lines 6-23; 26, lines 21-24).[FN15]
 https://nycourts.gov/reporter/webdocs/ConnollyvNina_Image5.pdf
Although the parties have differing approaches to medical care, Defendant's handling of Mary Alice's condition has not led to any documented deterioration in the dog's health. The differences in their caregiving methods — such as choice of food and treatments — reflect personal preferences, not a lack of proper care. Plaintiff admitted that surgery is no longer an option for Mary Alice due to her old age and weak heart, making it clear that minimizing her discomfort is a logical course of action [FN16]
(see id. at 44, lines 1-6). Hence, what makes the difference is Plaintiff's heavy reliance on Defendant to care for the dogs, especially during hospitalizations, which raises concerns about Plaintiff's long-term ability to provide consistent medical care.[FN17]

V. Living Environment
Defendant's living situation provides a stable and suitable environment for the dogs. Her home offers ample space for roaming, playing, and interacting with Defendant's other pets, as depicted in photos of the dogs lounging comfortably with Defendant's cats (see defendant's exhibits G11, G42). She also emphasized that while in her care, the dogs have received regular exercise at a nearby park, in contrast to Plaintiffs alleged failure to regularly take the dogs out during the day (see July 5, 2024 tr at 25, line 21, through 26, line 9; July 18, 2024 tr at 10, lines 4). Plaintiff claimed that she did exercise them (see July 5, 2024 tr at 26, lines 17-18; July 12, 2024 tr at 32, lines 4-6) and complained about them being over-exercised (see id. at 17, lines 6-8 ["From the condition of my animals when I picked them up from when they were with her, they were very, very exhausted all the time."]; July 12, 2024 tr at 21, line 17 ["She is taxing them, their energy."]; 22, lines 9-10 ["(Mary Alice) needs to rest, not going to the dog runs."]; 34, line 3 ["S]he taxes them. She overdoes their energy."]). Perusing the photos submitted by Defendant, however, the dogs appear content (see Defendant's exhibits F, G).
The Court acknowledges Plaintiff's testimony in response to Defendant's regarding the dogs being taken out side, which included the following:
Yes, I do the same. I take them out twice a day. They play with each other and they - - there's a testimonial letter. They play with - - Mary Alice doesn't play with other dogs. She can sniff a dog and, you know, be friendly on the street, but she doesn't - - her eyes are too tender. They get recreation with me. They have a wonderful life with me.
I'm grateful to you for not having Miss Nina bring them to court. It would have stressed them, but you would have seen them run to me. They're afraid of her.
(July 18, 2024 tr at 42, line 24, through 43, line 9.)
Plaintiff's living conditions, however, raise concerns. She has a small studio (see July 5, 2204 tr at 22, line 9). Defendant testified that during a visit to Plaintiff's home she observed unsanitary conditions with the floor covered in blankets with urine and feces (see id. at 25, lines 20-21; July 18, 2024 tr at 10, lines 1-5). After the October 2024 incident in Long Beach, "[Defendant] had to give them two baths when [she] brought them home. They were disgusting" (id. at 27, lines 20-21). Additionally, Plaintiff's repeated hospitalizations resulting in the dogs being taken to shelters as well as Defendant's care for the dogs for sometimes up to 56 days at a time raises serious concerns about Plaintiff's ability to consistently provide a safe and stable home (see July 12, 2024 tr at 37, lines 1-6). Thus, based on the testimony and evidence presented, this factor weighs strongly in favor of Defendant.

 Conclusion
In arriving at its determination, the Court has considered the testimony and documents submitted by the parties. To the extent that there was any discrepancy between the testimony of Plaintiff and that of Defendant, the Court resolves it in favor of Defendant. Plaintiff's lack of transparency regarding the times and under what circumstances Mary Alice and Henry had been taken in by Defendant undermined Plaintiff's credibility. Answering "No" to the question, "Are there periods of time that you spend on the beach or outside of your apartment?" (July 5, 2024 tr at 28, lines 1-3) was not really accurate, considering Plaintiff's hospitalizations. The Court also feels that Plaintiff could have been more forthcoming concerning the trip to Long Beach: why she toted the dogs out there instead of boarding them with Defendant, whose services she had used previously; why she did not go straight to her destination in Rockville Centre, considering that the dogs were with her; and why she took a chance of something happening to the dogs if she fell asleep. Further, Plaintiff did not satisfy the Court that her apartment was not as described by Defendant: unsanitary, with the dogs lying in urine and feces.
Defendant demonstrated a stronger ability to provide consistent care, immediate financial support, a stable living environment, and permanent, continuous companionship. That Mary Alice and Henry have enjoyed socializing with other dogs (and even with their fellow cat residents) and humans while under Defendant's care is a very strong consideration. Defendant's bond with the dogs, reinforced by her professional experience with animals, further supports the conclusion that it is in the best interests of Mary Alice and Henry to remain in her custody. We are approaching the one-year anniversary of the October 14, 2023 incident at Long Beach. Continuity is important is a pet's life (see Raymond 264 AD2d at 341 [cat to remain where he lived, prospered, loved and was loved for four years]). Having resided with Defendant for a year straight by now, it would be cruel to uproot the dogs at this point. Although letters in support praised Plaintiff's devotion and care given to her pets, in light of Plaintiff's past absences, there is reasonable concern about the dogs' future well-being should they be sent back to her, and this Court will not subject Mary Alice and Henry to a filthy, urine- and feces-laden household.
Dogs are now treated as members of the family under modern, enlightened jurisprudence. Nudged by legislative advances regarding the treatment of pets, the status of dogs under the common law has evolved. They, no less than humans, deserve a safe, stable, stress-free home environment where they will not be subjected to being uprooted periodically. Defendant has and will continue to provide such an environment, in this Court's view. Plaintiff's ability to provide it is questionable. While the Court sympathizes with Plaintiff, who predictably will sustain an emotional loss from being cut off permanently from Mary Alice and Henry, said impact must be subordinated to the best interests of the dogs, especially since the law calls for the application of the "best for all concerned" standard (see id. [emphasis added]). In this case before the Court, Plaintiff's interests are outweighed by those of Mary Alice and Henry. The dogs will be well cared for by Defendant. It is in Mary Alice's and Henry's best interests that they remain in the care of Defendant.
The Court declines to consider separating the dogs as it may cause them distress after living together for so long. Shared custody or visitation is also not considered by the Court due to the hostility observed between the parties, principally by Plaintiff; this would inure to the detriment of the dogs.
Accordingly, IT IS HEREBY DECLARED, ORDERED and ADJUDGED that Plaintiff's 
motion for summary judgment is DENIED; Plaintiff's complaint (in the form of 
supporting papers) is dismissed; custody of Mary Alice and Henry, depicted 
hereinafter (defendant's exhibit G6), is awarded to Defendant; and, upon 
presentation of a copy of this Decision, Order, and Judgment, any governmental 
agency recording Mary Alice and Henry as being Plaintiff's dogs shall amend 
their records to reflect that Defendant is their legal guardian. 
https://nycourts.gov/reporter/webdocs/ConnollyvNina_Image6.pdf
E N T E R
HON. AARON D. MASLOW
Justice of the Supreme Court of the State of New York

Footnotes

Footnote 1: A puggle is a mix of a pug and a beagle (see Puggle, Wikipedia, available at https://en.wikipedia.org/wiki/Puggle [last accessed Oct. 2, 2024]).

Footnote 2: The photo (defendant's exhibit F10), taken by Defendant, depicts Mary Alice and Henry at Plaintiff's home in Brooklyn. Defendant testified: "All over the floor was covered in blankets, which is why I didn't want to stay in with them. She didn't walk the dogs. All the surfaces were just covered in urine." (July 18, 2024 tr at 10, lines 3-5.)

Footnote 3: Defendant submitted numerous photographs into evidence. Plaintiff testified that she had no photos of the dogs — that the moving company lost them when she moved from Brooklyn to Manhattan and that she lost the ones on her phone when it was stolen while sleeping on the beach at Long Beach (see July 12, 2024 tr at 19, lines 7-10; 44, lines 21-25).

Footnote 4: The Court notes the difficulties and complexities faced by the Kings County Supreme Court Help Center in assisting pro se litigants in preparation for court appearances. However, the system could be streamlined by providing unrepresented plaintiffs with a description of how to commence litigation with the appropriate papers. This Court emphasizes the importance of qualified representation and the need for litigants to be properly apprised of the procedural and substantive aspects of the law.

Footnote 5: The Court was unable to locate a written response from Defendant to Plaintiff's initiating papers. The Court deems the exhibits submitted by Defendant at the hearing to constitute answering papers. This is consonant with the notion that "courts will routinely afford pro se litigants . . . some latitude" (Mirzoeff v Nagar, 52 AD3d 789, 789 [2d Dept 2008]); see Tracy v Freshwater, 623 F3d 90, 101-103 [2d Cir 2010] [discussion regarding solicitude accorded pro se litigants in federal courts]). Procedural formalities should be relaxed for disputant pro se parties in order to bring about a resolution to their legal quarrel. It is also noted that while Plaintiff raised pro forma objections to evidence and testimony from Defendant, she did not identify any particular grounds rooted in the rules of evidence or other binding protocols. Both parties acquiesced to the manner in which the Court conducted the three-day fact-finding hearing, i.e., taking testimony, receiving exhibits, and hearing argument. The Court recommends that the legislature add a provision to the CPLR to enable pro se litigants to have disputes resolved in the courts without the attendant need to comply with the plethora of litigation mandates more relevant to actions between attorney-represented parties. While this process might resemble arbitration, it is noted that many pro se parties desire to have their disputes resolved by a judge. There should be a process for a court to adjudicate a dispute between pro se parties who, like Plaintiff, "don't know what the rules of evidence means" (July 18, 2024 at 10, lines 18-19).

Footnote 6: Parties may wait as long as two years for their case to go to trial due to discovery haggling and full trial calendars.

Footnote 7: Plaintiff testified: "The only reason I kept going back to her was because I really didn't have anyone else. I have some difficult family problems, and I have no one to take care of [them]" (July 5, 2024 tr at 14, lines 23-25).

Footnote 8: Defendant's exhibit G was a compendium of photographs. Each photo was individually marked with a sequential number after the letter G.

Footnote 9: Contrary to Plaintiff's protestations about the dogs living with cats (see July 5, 2024 tr at 23, lines 5-10 ["Mary Alice and Henry are terrified of cats. . . ."]; id. at 25, lines 9-12 ["Please give them back to me. They're with the cats. Please give them back to me, your Honor. They're with the cats."]), these photos confirm Defendant's testimony that her cats and the dogs get along together. The photos depict Chip, Defendant's overweight cat, on the bed with Mary Alice and Henry. The only problem the Court observes with this situation is that Chip needs to go on a diet.

Footnote 10: Neighborhood folks are fans of Henry, according to Defendant (see 
July 18, 2024 tr at 23, line 25, through 24, line 2; 24, line 25, through 25, 
line 4). The Court doubts that Henry would be exposed to the same type of human 
interaction in Plaintiff's care. 

Footnote 11: Since he is a minor, the child's face has been blurred by the Court to preserve his privacy.

Footnote 12:Quite evidently, under Defendant's aegis, Henry has flowered into a social butterfly.

Footnote 13: Depicted clockwise on page 8 from the top left are Mary Alice with a friend, Mugsy (see July 18, 2024 tr at 17, lines 1-2; defendant's exhibit G18); Henry with other dogs at the dog park, the black one being Sting and the one with the red coat being Cocoa (see July 18, 2024 tr at 19, line 24, through 20, line 4; defendant's exhibit G24); Mary Alice and Henry with Ruby (see July 18, 2024 tr at 21, lines 21-23; defendant's exhibit G30); Henry standing on top of Bambi, "a German Shepherd/Rhodesian Ridgeback mix. She's a very large dog. . . . Henry is not afraid to jump on top of large dogs, play with them. He has a great time," while Sing, another dog, looks on (July 18, 2024 tr at 17, lines 11-23; see defendant's exhibit G19); and Daisy, whom Henry has a crush on (see July 18, 2024 tr at 19, lines 7-8). "That's them walking by the water. That's when I was training him to be . . . off leash, not go too far from me. That was off training with Daisy. She'll run and catch him if he goes off," testified Defendant (Id. at 19, lines 8-14; see defendant's exhibit G23).

Footnote 14: The Court takes the mental health of its employees, attorneys, and pro se litigants seriously and does not seek to disclose more information than necessary about anyone's tribulations. However, it should be noted that although Plaintiff displayed erratic and concerning behavior during the hearings in addition to being heard casting threats in frenzied voicemails, such was not considered in this decision as neither implicated Plaintiff's ability to care for the dogs.

Footnote 15: Plaintiff took umbrage at Mary Alice being given CBD, accusing Defendant of attempting to kill the dog (see July 18, 2024 tr at 26, lines 4-9). The amount was miniscule and helped Mary Alice keep calm, according to Defendant; she said it also helps with joint pain (see id. at 24, lines 6-23). There is support for its usage in treating osteoarthritis in dogs (see CBD: What you need to know about its uses and efficacy, Cornell Richard P. Riney Canine Health Center, available at 
https://www.vet.cornell.edu/departments-centers-and-institutes/riney-canine-health-center/canine-health-information/cbd-what-you-need-know-about-its-uses-and-efficacy [last accessed Oct. 2, 2024]). Therefore, this Court draws no adverse inference from Defendant's providing CBD biscuits to Mary Alice.

Footnote 16: The Court is not an expert in veterinary care and will not opine on the best treatment for Mary Alice. However, focusing on maintaining comfort over aggressive treatments aligns with the needs of an elderly pet.

Footnote 17: Plaintiff herself testified, "I really didn't have anyone else [to care for the dogs]. I have some difficult family problems, and I have no one to take care of - -" (July 5, 2024 tr at 16, lines 23-24). The Court is concerned that were the dogs awarded to Plaintiff and she no longer used Defendant's services during hospital stays, nobody else would be available to care for the dogs and they would be taken to the pound and perhaps euthanized — especially considering that Mary Alice presents with obvious health issues such as her eye and orthopedic conditions.